**SUMMIT TECHNOLOGY, INC.**

v.

**HEALTHCARE CAPITAL GROUP, INC., Michael M. Harshbarger.**

**Civ. A. No. 90–12751–H.**

United States District Court, D. Massachusetts.

March 19, 1992.

Robert D. Cultice, Goldstein & Manello, Boston, Mass., for plaintiff.

Robert M. Buchanan, Sullivan & Worcester, Boston, Mass., for Mark Roberts.

Peter C. Knight, James M. Fay, Morrison, Mahoney & Miller, Boston, Mass., for defendant.

MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR ORDER COMPELLING DISCOVERY (# 48)

COLLINGS, United States Magistrate Judge.

The issue before the Court is whether a non-party deponent should be compelled to answer questions that he refused to answer at his oral deposition. To place the controversy in context, a recitation of the underlying background facts of this litigation is in order. As culled from the verified complaint and relevant moving papers,

there is no material dispute with respect to these historical facts.

The plaintiff, Summit Technology, Inc. ("Summit"), is a publicly traded Massachusetts corporation engaged in the business of designing, manufacturing and selling medical equipment, processes and systems primarily based on excimer laser technology. Summit's principal product is an excimer laser system for opthalmic surgical applications including photorefractive keratectomy ("PRK"). PRK is a surgical technique often referred to as "corneal sculpting" whereby corneal tissue is removed with laser pulses to correct such common visual problems as near-sightedness, far-sightedness and astigmatism.

Before its laser system can be commercialized in the United States, Summit must receive approval from the Food and Drug Administration ("FDA"). Toward that end, Summit has been conducting clinical tests under the auspices of the FDA through opthamologists at medical centers and hospitals across the country. Findings from these clinical tests are reported periodically to the FDA on a confidential basis so as to allow the FDA to evaluate the performance and safety of the laser system.

Summit has invested millions of dollars in research and development of its laser system. As of October 1, 1990, Summit was only one of three domestic companies engaged in FDA-monitored clinical testing of excimer lasers for corneal applications. Whether Summit will be able to market its laser for general medical use in the United States and thereby recoup its investment is dependent upon the success of the clinical tests.

Although prohibited from commercializing its laser system to the medical community at large in the United States consequent to FDA regulations, Summit is under no such restriction with respect to other countries. Indeed, Summit has sold numerous excimer laser systems in the international market.

Defendant Michael M. Harshbarger ("Harshbarger") is the founder of defendant Healthcare Capital Group, Inc. ("Healthcare"), an Illinois corporation in the business of investment banking activities in the field of emerging medical technology. Harshbarger testified at his deposition that Healthcare, formed in July of 1990, was a "pre-merchant bank" that had not as yet been capitalized.

On or about September 27, 1990, Harshbarger prepared and distributed a document entitled "Purchase Recommendation–Phoenix Laser Systems, Inc." ("Phoenix Report") to at least 250 persons and companies viewed as potential investors. The subject of the Phoenix Report was a surgical workstation being developed by Phoenix Laser Systems, Inc. ("Phoenix"). In the report, not only was the Phoenix surgical workstation described in quite favorable terms, it was presented as a preferable alternative to all excimer lasers including the one manufactured by Summit. The ultimate conclusion of the report was the recommendation that stock in Phoenix be purchased.

One section of the Phoenix Report was entitled "The Downside to Excimers" wherein certain alleged limitations and early side effects of excimer laser use were described. It is this portion of the report that lies at the heart of the instant lawsuit. In particular part, it is stated that use of excimer lasers in clinical tests has resulted in "1–2% irreversible opacification (blindness) to the cornea in the first *250* patients." Summit contends that this representation is false and, in fact, that no blindness has been reported consequent to the use of its laser system.

Summit filed a two-count complaint against Harshbarger and Healthcare in the Superior Court for Middlesex County, Massachusetts, which was subsequently removed to the federal court. Count I is a claim for libel. Summit alleges that the defendants' statement in the Phoenix Report that use of excimer lasers has produced "1–2% irreversible opacification (blindness) to the cornea in the first *250* patients" is false or, alternatively, if true, was made with actual malice. Count II of the complaint alleges violation of Massachusetts General Laws, Chapter 93A. Among the affirmative defenses that

Harshbarger and Healthcare have interposed to Summit's claims are the assertions that the statements alleged to be false and defamatory are in fact true (Fifth Affirmative Defense) and that said statements were made in good faith and in the reasonable belief that they were true. (Sixth Affirmative Defense)

At his deposition, Harshbarger testified that subsequent to the publication of the Phoenix Report, Phoenix hired Harshbarger International, a company with which Harshbarger is associated, as a financial advisor, agreeing to pay up to a 5% finder's fee of the amount placed by an investor. Harshbarger further testified that "one of the particular references" or sources upon which he based the statement concerning 1–2% blindness in the first 250 patients was an article authored by Mark Roberts ("Roberts"), the non-party deponent.

According to his affidavit, Roberts is an investment analyst employed by Off Wall Street Consulting Group, Inc., of which he is the president and sole stockholder. His business is to perform independent research and analysis of publicly traded companies, including companies that manufacture lasers used in eye surgery, to institutional investors. In September of 1990, Roberts published a report on Summit entitled *"Blinded by the Light,"* the article upon which Harshbarger purportedly relied. In his report, Roberts stated, *inter alia:*

> Recently, we heard a report from Europe that 4 or 5 of Dr. Theo Seiler's patients (Dr. Seiler is the most experienced user of the Summit system) were experiencing a central opacity (blindness) in the cornea which was not going away. Two separate sources from two different countries reported this same story about Seiler's first 250 patients. If this were true, and these results were repeated, it could prevent the FDA from ever approving the procedure for widespread use.

Harshbarger testified that he converted Roberts' 4–5 patients among the first 250 into percentage terms when he stated the 1–2% of patients suffered blindness in the Phoenix Report.

Both Harshbarger and Roberts admit that they did not independently verify the accuracy of their information with Dr. Seiler prior to the publication of their respective reports. At his deposition and in his affidavit, Roberts testified that his "[t]wo separate sources from two different countries" were a Dr. Traverso in Italy and a Dr. Grabbner in Austria, both of whom were purportedly told by Dr. Seiler about the opacification reported in his article. Roberts did not personally communicate with either Dr. Traverso or Dr. Grabbner; he rather relied upon information received from two in-between sources.

At his deposition, Roberts revealed that John Solow, an officer of Phoenix, was his source for the statement attributed to Dr. Grabbner. Although he testified with respect to the substance of the conversation he had with his second source and produced his notes taken on that conversation, Roberts refused to identify the person claimed to have been his source for the remarks allegedly made by Dr. Traverso. Pursuant to Fed.R.Civ.P. 37(a), Summit seeks an order to compel Roberts to name that second source.

The language of the general provisions of Rule 26, Fed.R.Civ.P., underscores the tensions inherent in the conduct of discovery in civil cases. As the First Circuit has aptly noted:

> The conflicting considerations are contained in the language of the Rule. On the one hand, "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter ... It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1). On the other hand, the Court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: ... (4) that certain matters not be inquired into, or that the scope of discovery be limited to certain matters;

(5) that discovery be conducted with no one present except persons designated by the Court; (6) that a deposition after being sealed be opened only by order of the Court; (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way," Fed.R.Civ.P. 26(c).

*Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 596–597 (1st Cir. 1980).

The Court continued, stating that when applying these principles in a case such as the one at bar where revelation of the identity of sources is sought, "[t]he plaintiff must establish relevance of the desired information and the defendant has the burden of establishing need for preserving confidentiality." *Id.* at 597, citation omitted.

Summit asserts that the information it seeks is relevant and non-privileged. Whether Summit is deemed to be a private or limited public person for purposes of this libel action will effect the burden of proof the plaintiff will bear in proving its case. *See, e.g., Elm Medical Laboratory v. RKO General*, 403 Mass. 779, 785–786, 532 N.E.2d 675, 680 (1989). Whatever that burden may be, i.e., proof of falsehood or actual malice, there can be no doubt that the truth of the Phoenix Report is a central issue in this litigation. This conclusion is underscored by the fact that the defendants have asserted the truth of their statements as a defense to Summit's libel claim. The information Summit seeks is relevant to this crucial issue and, indeed, the non-party deponent concedes as much.

■ Contrary to Summit's position, however, Roberts contends that the information sought, i.e., the identity of his second source, is privileged. In his affidavit Roberts explains:

In preparing and publishing reports on companies and their products, I conduct independent research, including obtaining information from a wide variety of individuals. Some of these individuals speak to me only on the understanding that what they say will not be attributed to them by me.... I am part of a wide network of investigators in topics pertaining to securities and the business world. For example, in the most recent issue of *Business Week* (October 7, 1991) at 130 appears a piece on Summit.... As the piece indicates, the reporter, Jeffrey M. Laderman, relied in part on information provided by me for his report. Similarly, *Barron's* (September 16, 1991) at 53–54 also treated the topic of Summit's stock. While I am not mentioned in that article, I was one of the sources relied upon by author, Alan Abelson.

Affidavit of Mark Roberts, # 52, para. 5.

Whether or not Roberts is a member of the "organized press" *per se*, it appears that he is engaged in the dissemination of investigative information to the investing business community. It further appears that the "speech" at issue (the Roberts' article) relates to "matters of public concern" as opposed to "matters of private concern" and, therefore, is accorded higher First Amendment protection. *Dun & Bradstreet Inc. v. Greenmoss Builders*, 472 U.S. 749, 759, 105 S.Ct. 2939, 2945, 86 L.Ed.2d 593 (1985). In short, in this instance, Roberts is entitled to raise the claim of privilege with respect to his confidential source as would any other media reporter.

■ Given that this is a diversity case with Summit's claims arising out of state law, counsel concur that pursuant to Rule 501, Fed.R.Evid., Massachusetts state law determining the privilege of a witness governs. In this instance, whether state law or federal law controls is of little practical consequence in that both the Supreme Judicial Court (SJC) and the First Circuit have employed virtually identical balancing tests. As recently articulated by the SJC, the balancing test requires "... weighing (a) the public interest in having every person's evidence available against (b) the public interest in the free flow of information." *In re John Doe Jury Investigation*, 410 Mass. 596, 599, 574 N.E.2d 373, 375 (1991). *Compare, Bruno & Stillman, Inc. v. Globe Newspaper Co., supra*, 633 F.2d at 595–596 ("[C]ourts must balance the poten-

tial harm to the free flow of information that might result against the asserted need for the requested information.")

Applying this balancing test, it is important to bear in mind that it is the truth or falsity of the Phoenix Report that is fundamental to the libel claim. The author of the Phoenix Report, Harshbarger, contends that he relied upon Roberts' report. Roberts, in turn, claims to have relied upon statements from Drs. Traverso and Grabbner, both of whom purportedly had conversations with Dr. Seiler. In the chain, it is a source between Roberts and Dr. Traverso who is unnamed. While the identity of this source is relevant for discovery purposes, it is more tangential than primary.

Summit's key evidence in proving the falsity of the statements in the Phoenix Report would be the actual clinical test reports of Dr. Theo Seiler which Summit has in its possession. Further, Summit knows the identity of the persons who allegedly talked to Dr. Seiler, i.e., Dr. Traverso and Dr. Grabbner, and is planning to depose them. The identity of an in-between source who merely relayed the substance of Dr. Traverso's alleged conversation with Dr. Seiler will not directly bear upon the truth or falsity of the Phoenix Report. Moreover, given that Summit has been apprised of the content of the conversations between the unnamed source and Dr. Traverso as well as the time frame within which these conversations took place, it is certainly possible that Dr. Traverso would be able to identify the in-between source.

In short, Summit's need to learn the name of Roberts' source is not crucial to its case and, in any event, Summit may well be able to learn the source's identity from a person other than Roberts.

In his affidavit, Roberts states that his unnamed source agreed to speak only on the understanding that what the source said would not be attributed to him. In other words, Roberts specifically agreed to maintain the identity of his source as confidential. Roberts avers that

> If I am forced by Court order to breach my obligation of confidence to the undisclosed source, I will not only lose that person as a source for future information but quite likely will find other doors shut to me in the financial world that otherwise would have opened and led to discussions that are an important part of my research.... Without the leads, my work would be greatly hampered. By chance, it also happens that the undisclosed source is an important purchaser of my analyses and reports. If I am forced to disclose his name, I am relatively certain that I will lose what to me is an important source of income.

Affidavit of Mark Roberts, #52, para. 10. Thus it appears that the information was given to Roberts on condition that the source be accorded anonymity, a condition to which Roberts explicitly agreed. Roberts' affidavit provides a basis for the reasonable belief that breach of this guarantee of confidentiality will likely impede the free flow of information to Roberts in the future and be detrimental to him in monetary terms.

Having considered the contesting values and factors at hand, the Court, in its discretion, finds the balance to weigh in favor of the non-party deponent. At this point in the proceedings, Summit's case is not fully developed. If, subsequent to the depositions of the three doctors in Europe, Summit is yet unable to ascertain the identity of the unnamed source, and the indications of the relevance of this information to the plaintiff's case become stronger, the Court would be amenable to revisiting this issue. However, on the record presently before the Court, Roberts' need for preserving the confidentiality of his source and the public interest in the free flow of information outweigh Summit's need for the information and the public interest in having every person's evidence.

Accordingly, it is ORDERED that Plaintiff's Motion For Order Compelling Discovery (#48) shall be, and hereby is, DENIED without prejudice to renewal as set forth hereinabove.