907 A.2d 855

**FORENSIC ADVISORS, INC., et al.**

v.

**MATRIXX INITIATIVES, INC.**

**No. 2621, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

Sept. 19, 2006.

Timothy M. Mulligan, Rockville, for Appellant.

David C. Tobin (Ziad P. Haddad on the brief), Washington, DC, for Appellee.

Panel: MURPHY, C.J., DEBORAH S. EYLER, and MEREDITH, JJ.

MURPHY, Chief Judge.

In this appeal from the Circuit Court for Montgomery County, Forensic Advisors, Inc. and Timothy M. Mulligan, appellants, present two questions for our review:

1.  Whether the circuit court erred when it failed to apply the correct legal standard by failing to quash the non-party subpoena in this SLAPP suit where Matrixx [Initiatives, Inc., appellee] failed to show that it had filed an actionable case and that it had a legitimate need for the material sought.

2.  Whether the circuit court erred when it refused to rule on Forensic Advisor's claim of the news media privilege.

For the reasons that follow, although we agree with appellants that they are entitled to assert the "news media privilege," we also agree with the circuit court "that the deposition should go forward."

### Relevant Factual Background

Appellant Forensic Advisors, Incorporated ("FAI") is a Maryland corporation that publishes *The Eyeshade Report*, a newsletter about publicly traded companies, which is distributed to FAI's subscribers via the Internet. Appellant Timothy M. Mulligan, Esq. is the founder, president, and sole shareholder of FAI. Matrixx Initiatives, Inc. ("Matrixx"), a Delaware corporation, has its principal place of business in Arizona, and its stock is publicly traded on the NASDAQ stock exchange under the symbol MTXX. In the words of appellees' brief:

Through its subsidiary, Zicam, LLC, Matrixx produces and sells several different products under the Zicam brand, all of which are nasal applicants targeted at alleviating the symptoms and effects associated with the common cold, allergic reactions, and nasal congestion. Matrixx's stock is publicly traded ... and, as such its stock prices are negatively affected by false information and false statements published by individuals and made available to all stockhold-

ers and potential investors through a variety of media, including the Internet.

Over the past several years, Matrixx has been the target of a large number of negative, defamatory statements publish-ed on the Internet through message boards dedicated to stock discussions. During this time period, trading on the Matrixx stock has been unusual, characterized by relatively large-volume "short" selling activity transactions which seek to capitalize on a decrease in stock price near the time that the market closes. Upon information and belief, these defamatory statements are made and coordinated by indi-viduals engaged in illegal short-selling schemes, who are attempting to negatively affect Matrixx's stock price for their financial benefit.

In December of 2002, Matrixx filed a lawsuit in Maricopa County, Arizona.[1] Appellants are not parties to the Arizona lawsuit.[2] An August 2003 edition of *The Eyeshade Report* contained (in the words of appellants' brief) "a detailed, 23 page report with 104 footnotes ... that expressed concerns regarding certain aspects of Matrixx's accounting and business operations." In the words of appellees' brief:

The [FAI] report contained a number of misleading state-ments regarding Matrixx's sales growth, business relations, gross profit margins, potential earnings, statutory compli-ance and other operational matters [and that] [s]ome of these statements bear a striking resemblance to the types of statements and information which formed the basis for Matrixx's lawsuit in Arizona.

---

**1.** *Matrixx Initiatives, Inc. v. Steven Edward Dick, et al.,* CV2002–023934 (AZ Superior Court, Maricopa County). In that case, Matrixx has requested that several named and unnamed defendants be enjoined from making defamatory statements about its products.

**2.** Several defendants were unnamed because the allegedly defamatory statements were made on Internet sites (such as message boards) using pseudonyms and aliases such as "veritasconari," "gunnallennlies," "charles0ponzi," "Floydtheoneandonly," "twocrookedattorneys," "pa-infullyblunt2004," "truthseekercom," and "TheTruthseeker."

On October 28, 2003, Matrixx applied to the Arizona court for leave to take a foreign deposition. That application was granted, and the Arizona court issued a commission that "authorized [Maryland] to cause to be issued a subpoena duces tecum" to appellants. On October 31, 2003, the Circuit Court for Montgomery County issued a subpoena to "FORENSIC ADVISORS INC C/O STATUTORY AGENT, TIMOTHY M. MULLIGAN," which "commanded [that Mr. Mulligan] personally appear and . . . produce [records and documents described in an attached subpoena duces tecum]." According to appellants, they responded to this subpoena by producing "383 pages of documents[.]"

On August 16, 2004, Matrixx petitioned the Arizona court for another commission to take a foreign deposition of Mr. Mulligan. That petition was granted, and the Arizona court issued a commission that "authorized [Maryland] to cause to be issued an amended subpoena duces tecum for the taking of the deposition of the following individual: Mr. Timothy M. Mulligan Forensic Advisors, Inc." On August 26, 2004, the Circuit Court for Montgomery County issued the following subpoena:

To: TIMOTHY M MULLIGAN
FORENSIC ADVISORS INC
8101  CONNECTICUT AVENUE # N109
CHEVY CHASE MD 20815

You are commanded to personally appear and [X] produce the following:
SEE ATTACHMENT
At CAPITOL PROCESS SERVICES
9892  HOLLOW GLEN PLACE, SILVER SPRING,
MD 209100–1138

On Friday, the 22nd day of October, 2004 at 10:00 A.M.

Attached to the subpoena was an AMENDED SUBPOENA DUCES TECUM that "commanded" Mr. Mulligan to produce "books, papers, documents, or tangible things" described in the subpoena. The record shows that Mr. Mulligan was

served with the subpoena duces tecum on September 13, 2004.[3]

Thereafter, in a letter to Mr. Mulligan,[4] appellees' counsel stated that Mr. Mulligan was "served with a Subpoena at [his] address . . . on September 13, 2004 at 10:00 a.m." This letter also stated:

> Because you have been legally served with the Subpoena, you are required by law to appear for this deposition. If you do not appear, a warrant may be issued for your arrest. Please contact me regarding the deposition. We are willing to discuss with you when and where the deposition takes place, if you find this date inconvenient. But, in the absence of an agreement with us, we will expect you to appear for the deposition.

In a letter dated October 9, 2004, Mr. Mulligan responded to appellees' counsel, advising that he intended to file a protective order so that "discovery may not be had," and asserted the following reasons why a protective order should issue:

> 1.) Neither Forensic Advisors, Inc. nor Timothy M. Mulligan were personally or properly served; 2.) The subpoena names two different entities, Timothy M. Mulligan and Forensic Advisors, Inc., without clarifying which of those two entities the plaintiff is attempting to subpoena; 3.) Neither Forensic Advisors, Inc., nor Timothy M. Mulligan ever communicated with Floyd Schneider in any manner

---

**3.** On September 21, 2004, a private process server executed, and filed in the Circuit Court for Montgomery County, an AFFIDAVIT OF SERVICE declaring under penalty of perjury:

> That at 4:10 pm on September 13, 2004, [a duly authorized, private process server] served Timothy M. Mulligan at 805 North Stonestreet Avenue, Rockville, Maryland 20850 by serving Timothy M. Mulligan, personally. Described herein:
>
> SEX     - MALE AGE - 48
> HEIGHT - 6' 0"
> WEIGHT - 180
> COLOR   - WHITE

**4.** This letter is "dated" August 17, 2004, but "postmarked" September 17, 2004.

prior to receipt of a subpoena from the plaintiff in this manner on November 4, 2003; 4.) If there were any communications with Floyd Schneider on or after November 4, 2003 regarding the plaintiff, it would be protected by the reporter's privilege; 5.) Neither Forensic Advisors, Inc., nor Timothy M. Mulligan has any information regarding the identities of individuals known on the Internet as "veritasconari," "gunnallennlies," or "painfullyblunt2004;" 6.) The Sixth Amended Complaint in this action states that "Floydtheoneandonly," "charlesp0nzi," "thetruthseekercom," are pseudonyms used by Floyd Schneider; 7.) Neither Forensic Advisors, Inc. nor Timothy M. Mulligan has ever communicated with anyone representing themselves as "veritsconari," "Floydtheoneandonly," "charles0ponzi," "thetruthseeker," "gunnallenlies," or "painfullyblunt2004;" [8].) Information regarding the identity(ies) of any source(s) for Forensic Advisors, Inc. concerning the plaintiff is protected by the reporter's privilege; [9].) Information regarding the subscriber/distribution list of Forensic Advisors, Inc. is a protected trade secret; [10].) Neither Forensic Advisors, Inc. nor Timothy M. Mulligan has any information regarding the short sale positions of any third party and, even if it did, such information is not relevant in a defamation action.

Mr. Mulligan's letter concluded with a request that he be provided in writing with whatever "basis [appellees] have as to why a Motion for Protective Order should not be filed[.]" In a letter dated October 14, 2004, appellees' counsel addressed each of Mr. Mulligan's issues.[5] On November 1, 2004, in the Circuit Court for Montgomery County (circuit court), appellants filed a motion entitled NON–PARTY DEPONENTS,

---

5. On the issue of "service," this letter stated:

[Appellee's] process server has provided us with an Affidavit of Service, stating that you [Timothy Mulligan] were served on September 13, 2004 at 4:10 p.m. at 805 N. Stonestreet Avenue, Rockville, Maryland 20850. The Affidavit of Service, a copy of which is attached, describes your physical appearance. Please clarify the basis for your claim that you have not been personally served in view of his Affidavit of Service . . .

FORENSIC ADVISORS, INC.'S AND TIMOTHY M. MULLIGAN'S, MOTION FOR A PROTECTIVE ORDER THAT A DEPOSITION NOT BE HAD AND TO QUASH A SUBPOENA DUCES TECUM. Thereafter, Mr. Mulligan filed an affidavit stating that (1) "two customers have told me that they will drop their subscriptions if the fact that they are subscribers is revealed to anyone[,]" (2) because some of FAI's customers are "sources" of the information provided in *The Eyeshade Report,* disclosure of FAI's customer list would create a substantial likelihood that the customer/sources would no longer be willing to provide information, and (3) if he were compelled to reveal confidential and/or privileged information, he was "relatively sure that [he] will lose what is an important source of income to [him]."

On January 18, 2005, the Honorable Eric M. Johnson held a hearing on appellants' Motion for Protective Order. During that hearing, Mr. Mulligan presented the following arguments:

> We would move for a protective order based on the fact that A) we were not served; B) the subpoena is defective because it names two different but related entities.

* * *

> [W]e also request a protective order based on the fact that we're entitled to the news media privilege, as well as the fact that our customer list is [confidential].

* * *

> I believe ... that the underlying law suit is really a [meritless] SLAPP suit. It's an acronym that stands for Strategic Lawsuit Against Public Participation. And the Maryland legislature just recognized last fall, how burdensome and harassing these kinds of lawsuits can be when they passed Section 5–807 of the Court and Judicial [Proceedings] article. So, not only do I contend that Forensic Advisors is subject to the news media privilege, but the underlying lawsuit is [meritless]. And if an underlying

lawsuit is [meritless], . . . there is no . . . right to conduct discovery.

The response of appellees' counsel included the following comments:

Your Honor, we simply want to take this gentleman's deposition. As the Court observed, there is a host of information in the public domain already, put there by Mr. Mulligan in his report that we're entitled to take his deposition on. What Mr. Mulligan would like the Court to do is to rule that he is not subject to discovery at all. In other words, a preclusive protective order that his deposition may not be taken.

* * *

As we pointed out in our papers, there is a wealth of information that Mr. Mulligan put in his [*EyeShade*] report that is relevant to this Arizona litigation, which is still pending by the way, has not been dismissed. . . . We have an active litigation in Arizona. We have a commission to take the deposition of Mr. Mulligan. Maryland is a member to the compact providing for subpoena of witnesses and depositions.

* * *

He is subject to discovery, and this is a simple deposition. This is not an effort to harass him or his subscribers. My client has agreed to enter into a protective order if necessary. . . . My client is not his competitor; [and does not] want to publish a financial report to his customers. But he is certainly subject to the normal processes of discovery. If there [are] particular issues regarding privilege that can and should be raised at a deposition, then they can and should be raised there.

After receiving evidence and argument, Judge Johnson delivered an on-the-record opinion that included the following findings and conclusions:

[T]he questions that [appellants are] concerned about can be dealt with on a question-by-question basis. If it's not admissible or if it ought to be protected, certainly the [c]ourt can, the rule will provide [appellant] that protection.

■ Appellants noted a timely appeal. "In situations where the aggrieved appellant, challenging a trial court discovery or similar order, is not a party to the underlying litigation in the trial court, . . . Maryland law permits the aggrieved appellant to appeal the order because, analytically, it is a final judgment with respect to that appellant." *St. Joseph Medical Center, Inc. v. Cardiac Surgery Associates, P.A., et al.,* 392 Md. 75, 90, 896 A.2d 304 (2006).

## Analysis

### I.

When it is necessary to obtain the testimony of a person who lives in Maryland, parties to litigation in a sister state have the very same rights as parties to litigation in a Maryland court. MD.CODE ANN., CTS. & JUD. PROC. § 9–401 (Lexis-Nexis 2006). Md. Rule 2–511 permits the use of a subpoena "to compel a nonparty . . . to attend, give testimony, and produce and permit inspection and copying of designated documents or other tangible things at a deposition."

■ Maryland Rule 2–403 provides the circuit court with authority to issue an order that will "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" of discovery.[6] The person seeking a protective order "has the burden of making a particular and specific demonstration of fact, as distinguished from general, conclusory statements, revealing some injustice, prejudice, or consequential harm that will result if protection is denied." *Tanis v. Crocker,* 110 Md.App. 559, 574, 678 A.2d 88 (1996). Even if

---

6. This Court applies the abuse of discretion standard when reviewing the circuit court's ruling on a motion to quash a subpoena filed by a non-party witness. *Prince George's County v. Hartley,* 150 Md.App. 581, 586–87, 822 A.2d 537 (2003).

the court agrees that some protection is necessary, a protective order "is not a blanket authorization for the court to prohibit disclosure of information whenever it deems it advisable to do so, but is rather a grant of power to impose conditions on discovery in order to prevent injury, harassment, or abuse of the court's processes." *Id.* at 575, 678 A.2d 88.

■■ Appellants argue that this Court should order that the subpoenas be quashed by applying the holding of *Katz v. Batavia Marine*, 984 F.2d 422 (Fed.Cir.1993). Under *Katz,* when the party who objects to discovery makes a *"prima facia* showing that the information sought is burdensome and not relevant, the burden shifts to the party seeking the information to demonstrate that the requests are relevant to the subject matter involved in the pending action." *Id.* at 424. According to appellants, this "burden shifting analysis" should also be applied to the issues of whether the information sought is "confidential," and/or entitled to "trade secret" protection. Appellants' suggested approach is inconsistent with the proposition that Maryland's discovery rules

> are broad and comprehensive in scope, and were deliberately designed so to be. . . . If all of the parties have knowledge of all of the relevant, pertinent and non-privileged facts, or the knowledge of the existence or whereabouts of such facts, the parties should be able properly to prepare their claims and defenses, thereby advancing the sound and expeditious administration of justice. In order to accomplish the above purposes, the discovery rules are to be liberally construed.

*Balto. Transit v. Mezzanotti,* 227 Md. 8, 13, 174 A.2d 768 (1961).

Moreover, even assuming that appellants have made a *prima facie* showing, they are simply not entitled to the overbroad relief that they requested from the circuit court. "Given the liberality with which discovery rules are to be construed in Maryland," *Tanis,* 110 Md.App. at 575, 678 A.2d 88, appellants are not entitled to quash a subpoena on the

ground that the subpoena calls for the production of a few documents that are entitled to protection.

■ Appellants also argue that the subpoenas should be quashed because the "underlying lawsuit is a meritless SLAPP suit," and SLAPP suits are against Maryland public policy.[7] According to appellants, the "circuit court's ruling circumvents the purpose of section 5–807 of the Courts and Judicial Proceedings article." Arizona law, however, is applicable to appellees' lawsuit.

Moreover, the Arizona lawsuit was filed on December 12, 2002. C.J. § 5–807, which took effect on October 1, 2004, expressly provides that

> this Act shall be construed to apply only prospectively and may not be applied or interpreted to have any effect on or application to any cause of action arising before the effective date of this Act.

Appellants also argue that (in the words of their brief) "it is contrary to the public policy of Maryland to recognize libel judgments obtained in foreign jurisdictions whose laws regarding defamation do not comport with Maryland's." For this proposition, appellants rely on *Telnikoff v. Matusevitch,* 347 Md. 561, 702 A.2d 230 (1997), which involved a judgment entered in England and the issue of comity. *Id.* at 574, 702 A.2d 230. The *Telnikoff* Court expressly stated that "[t]he public policy exception, among other things, distinguishes the

---

7. MD.CODE ANN., CTS. & JUD. PROC. § 5–807 (LexisNexis Supp.2005), in pertinent part, provides:

    (b) A lawsuit is a SLAPP suit if it is:

    (1) Brought in bad faith against a party who has communicated with a federal, State, or local government body or the public at large to report on, comment on, rule on, challenge, oppose, or in any other way exercise rights under the First Amendment of the U.S. Constitution or Article 10, Article 13, or Article 40 of the Maryland Declaration of Rights regarding any matter within the authority of a government body;

    (2) Materially related to the defendant's communication; and

    (3) Intended to inhibit the exercise of rights under the First Amendment of the U.S. Constitution or Article 10, Article 13, or Article 40 of the Maryland Declaration of Rights.

recognition of foreign judgments from the recognition of judgments rendered by other jurisdictions within the United States." *Id.* at 577 n. 13, 702 A.2d 230. If there is a reason why a Maryland court would not be required to give "full faith and credit" to a libel judgment entered in the Superior Court of Arizona for Maricopa County, appellants have yet to provide one.

■ Appellants now argue that the Complaint filed by Matrixx in the Arizona litigation is legally deficient and subject to dismissal on the ground that none of the three counts asserted states a claim upon which relief can be granted. This argument, however, was not presented to Judge Johnson, and we decline to exercise our discretion to consider it at this point in time.

## II.

■ Appellants argue that Judge Johnson erred when he refused to rule on the issue of whether the news media privilege could be asserted by Mr. Mulligan during his deposition.[8] Although we are not persuaded that Judge Johnson

---

8. MD.CODE ANN., CTS & JUD. PROC § 9–112 (LexisNexis 2002 & Supp.2005) provides:

(a) In this section, "news media" means:
(1) Newspapers;
(2) Magazines;
(3) Journals;
(4) Press associations;
(5) News agencies;
(6) Wire services;
(7) Radio;
(8) Television; and
(9) Any printed, photographic, mechanical, or electronic means of disseminating news and information to the public.
(b) The provisions of this section apply to any person who is, or has been, employed by the news media in any news gathering or news disseminating capacity.
(c) Except as provided in subsection (d) of this section, any judicial, legislative, or administrative body, or any body that has the power to issue subpoenas may not compel any person described in subsection (b) of this section to disclose:

erred or abused his discretion in concluding that the privilege issues should not be decided in a vacuum, for the guidance of the parties we shall address the issue of whether Mr. Mulligan is entitled to assert the news media privilege.

Neither the Court of Appeals nor this Court has been asked to determine whether a financial newsletter is entitled to the protection of the news media privilege. In *Deltec v. Dun & Bradstreet*, 187 F.Supp. 788 (N.D.Ohio 1960), the United States District Court for the Northern District of Ohio held that, although a financial newsletter was a "periodical" as that term was defined in Ohio's news media privilege statute, the newsletter was not entitled to assert the news media privilege. The basis for this holding, however, was that the Ohio statute

---

(1) The source of any news or information procured by the person while employed by the news media, whether or not the source has been promised confidentiality; or

(2) Any news or information procured by the person while employed by the news media, in the course of pursuing professional activities, for communication to the public but which is not so communicated, in whole or in part, including:

(i) Notes;

(ii) Outtakes;

(iii) Photographs or photographic negatives;

(iv) Video and sound tapes;

(v) Film; and

(vi) Other data, irrespective of its nature, not itself disseminated in any manner to the public.

(d) (1) A court may compel disclosure of news or information, if the court finds that the party seeking news or information protected under subsection (c)(2) of this section has established by clear and convincing evidence that:

(i) The news or information is relevant to a significant legal issue before any judicial, legislative, or administrative body, or any body that has the power to issue subpoenas;

(ii) The news or information could not, with due diligence, be obtained by any alternate means; and

(iii) There is an overriding public interest in disclosure.

(2) A court may not compel disclosure under this subsection of the source of any news or information protected under subsection (c)(1) of this section.

(e) If any person employed by the news media disseminates a source of any news or information, or any portion of the news or information procured while pursuing professional activities, the protection from compelled disclosure under this section is not waived by the individual.

expressly limited the "source of information" privilege to persons "engaged in the work of, or connected with, or employed by any newspaper or any press association." *Deltec* does not support the argument that financial newsletters are not part of the news media.

We are persuaded that *The Eyeshade Report* satisfies the definition of "news media," as that term is defined in C.J. § 9–112(a)(9). This conclusion is consistent with *Summit Technology v. Healthcare Capital,* 141 F.R.D. 381 (D.Mass.1992), which involved the question of whether a non-party deponent should be compelled to answer deposition questions regarding the sources of information he used to prepare a financial report that was the subject of a defamation action. In *Summit,* applying Massachusetts' common law principles, the United States District Court for the District of Massachusetts held that, "on the record presently before the Court," the appellant was not entitled to the identity of the deponent's sources. *Id.* at 385.

### Proceedings on Remand

We affirm Judge Johnson's ruling that Mr. Mulligan's deposition "go forward," because it is clear that the subpoenas issued to appellants seek much more information than is subject to protection under the statute. As Judge Johnson stated, "the questions that [appellants are] concerned about can be dealt with on a question-by-question basis. If ... [someone's identity or some privileged information] ought to be protected, certainly the [c]ourt can ... provide [appellant] that protection."

Although this Court does not issue advisory opinions, and shall not direct that a yet-to-arise discovery dispute be resolved in a particular way, we are persuaded that it would be helpful to paraphrase what this Court stated in *Prince George's County v. Hartley,* 150 Md.App. 581, 603, 822 A.2d 537 (2003):

Our conclusion that [Mr. Mulligan is a] compellable [deponent] does not mean that the Shield Law will be inapplicable to every question that [he] might be asked at the [deposi-

tion]. [Appellees'] right to meaningful [discovery] is not a license to acquire information protected by [C.J.] § 9–112[.]

■■■ Appellants' discovery obligations shall be controlled by the applicable provisions of the Maryland Rules of Procedure and the Maryland Discovery Guidelines. During Mr. Mulligan's deposition, assertions of privilege shall be governed by Guideline 6, which provides:

Where a claim of privilege is asserted during a deposition and information is not provided on the basis of such assertion:

(a) The attorney asserting the privilege shall identify during the deposition the nature of the privilege (including work product) which is being claimed; and

(b) The following information shall be provided during the deposition at the time the privilege is asserted, if sought, unless divulgence of such information would cause disclosure of the allegedly privileged information:

(1) For oral communications:

(i) the name of the person making the communication and the names of the persons present while the communication was made and, where not apparent, the relationship of the persons present to the person making the communications;

(ii) the date and place of the communication; and

(iii) the general subject matter of the communication.

(2) For documents, to the extent the information is readily obtainable from the witness being deposed or otherwise;

(i) the type of document, e.g., letter or memorandum;

(ii) the general subject matter of the document;

(iii) the date of the document; and

(iv) such other information as is sufficient to identify the document for a subpoena duces tecum, including, where appropriate, the author, addressee, and any other recipient of the document, and where not apparent, the relationship of the author, addressee, and any other recipient to each other;

(3) Objection on the ground of privilege asserted during a deposition may be amplified by the objector subsequent to the deposition.

(c) After a claim of privilege has been asserted, the attorney seeking disclosure should have reasonable latitude during the deposition to question the witness to establish other relevant information concerning the assertion of privilege, including (i) the applicability of the particular privilege being asserted, (ii) circumstances which may constitute an exception to the assertion of the privilege, (iii) circumstances which may result in the privilege having been waived, and (iv) circumstances which may overcome a claim of qualified privilege.

Implicit in Guideline 6, and particularly applicable to the case at bar, is the deponent's obligation to specify whether he or she is asserting an absolute privilege or a qualified privilege. During his deposition, Mr. Mulligan must specify whether he is asserting the absolute privilege for "source" identity, or the qualified privilege for information not disseminated.

We recognize the likelihood that, before Mr. Mulligan's deposition has been completed, the parties will be requesting that the circuit court resolve the issue of whether Mr. Mulligan must answer a particular question. In order to conserve valuable judicial resources, we remind the parties that Maryland Rule 2–415(h) provides as follows:

**Refusals to answer.** When a deponent refuses to answer a question, the proponent of the question shall complete the examination to the extent practicable before filing a motion for an order compelling discovery.

We are confident that *all* of the lawyers participating in Mr. Mulligan's deposition will fulfill their roles as officers of the court.

**ORDER DENYING MOTIONS TO QUASH AFFIRMED; CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; APPELLANTS TO PAY THE COSTS.**