71 A.3d 155

James CATLER, et al.

v.

ARENT FOX, LLP, et al.

Herschel M. Blumberg, et al.

v.

Arent Fox, LLP, et al.

Nos. 538, 2349 Sept. Term, 2011.

Court of Special Appeals of Maryland.

May 30, 2013.

Reconsideration Denied Sept. 3, 2013.

686

688

Jeremy W. Schulman (Kristin E. Draper, Alan B. Sternstein, Shulman, Rogers, Gandal, Pordy & Ecker, PA, Potomac, MD, John D. Pels, Jennifer O. Schiffer, Pels Anderson, LLC, Bethesda, MD), on the briefs, for Appellant.

John Buckley, Jr. (Enu A. Mainigi, William T. Burke, Thomas P. Windom, Williams & Connolly, LLP, Washington, D.C., Jeffrey M. Schwaber, Deanna L. Peters, Stein, Sperling Bennett, DeJong, Driscoll, PC, Rockville, MD), on the briefs, for Appellee.

Panel: MATRICCIANI, KEHOE and EMORY A. PLITT, JR., (Specially Assigned), JJ.

MATRICCIANI, J.

These consolidated appeals arise from a central factual situation but raise wholly disparate legal issues. In the interests of clarity, we begin by noting that the underlying

dispute began on October 27, 2010, when Herschel Blumberg,[1] on his behalf, for the estate of his wife, for his daughter Marjorie Blumberg, and for the corporate entities that they control, filed suit against appellees Arent Fox LLP, Arent Fox PLLC, and Gerard Leval, (collectively, "Arent Fox") in the Circuit Court for Montgomery County. The five-count complaint alleged legal malpractice, breach of fiduciary duty, breach of contract, fraudulent concealment, and constructive fraud.

During pre-trial discovery, appellees sent subpoenas *duces tecum* to non-parties James Catler, Mark Blumberg, and Susan Blumberg Levin in an effort to obtain relevant documents. The non-parties objected to certain requests for document production on the grounds of protective privilege. The circuit court found that no privilege applied to the documents in question and ordered their production. As permitted by statute, the nonparties noted timely appeals from the various orders of the circuit court.[2] That appeal is reflected in the caption to this opinion.

The contested documents were then produced, and, based on the discovery, the Arent Fox appellees proceeded to file a number of motions seeking summary judgment in the case. In total, appellees filed one motion to dismiss (which the court treated as a summary judgment motion under Maryland Rule 2–322(c)) and nine motions for summary judgment, each pertaining to a separate theory or issue. At the close of a two day hearing on the motions, the circuit court granted all of appellees' motions for summary judgment. Appellants noted a timely appeal from those orders. That is the second appeal

---

1. Mr. Blumberg is a named plaintiff. He filed the complaint through his guardian, Marjorie Blumberg.

2. MD.CODE ANN., CTS. & JUD. PROC § 12–301. "This statute does not restrict the right of appeal to the technical parties to a suit. A person may have such a direct interest in the subject matter of a suit as to entitle him to maintain an appeal, although he is not one of the actual parties." *Lickle v. Boone,* 187 Md. 579, 584, 51 A.2d 162 (1947).

now before us. On February 13, 2012, this court ordered that the appeals be consolidated.

## Questions Presented

The non-party appellants present eight questions for our review which we combine and rephrase for clarity as: [3]

---

3. Appellant Catler presents three questions. They are:

(I) Did the [c]ircuit [c]ourt err, as a matter of law, in ruling that [a]ppellant James Catler did not continue to have an attorney-client relationship with counsel that he retained, expressly and in writing, for legal advice and services in matters that resulted in the action below?
(II) Where there is no factual dispute that Mr. Catler undertook to prepare regularly and for over a year fact summaries and analyses under the direction and guidance of counsel in anticipation of and for litigation of the action below, did the [c]ircuit [c]ourt err, as a matter of law, in ruling that the work-product doctrine did not shield any such documents prepared before his undertaking was reduced to a formal written and compensatory agreement with counsel?
(III) Where Mr. Catler retained and remained a client of counsel for both him and Ms. Blumberg in connection with the action below and/or where Mr. Catler regularly served as a litigation support consultant to counsel in connection with the action below, did the [c]ircuit [c]ourt err, as a matter of law, in ruling that the confidentiality of certain written communications from in-house counsel for the Blumberg Entities to Ms. Blumberg, once disclosed to Mr. Catler, had been breached and the privilege protections for those communications thereby waived?

Appellants Mark Blumberg and Susan Blumberg Levin present five questions. They are:
(I) Did the lower court err in finding that the Blumberg [a]ppellants' privilege logs were untimely and legally insufficient in description and that the [d]efendants had been prejudiced as a result thereof despite the fact that the Blumberg [a]ppellants timely filed an objection pursuant to Maryland Rule 2–510(f); that the undisputed record supported by affidavit pursuant to Rule 2–311(d) is that the parties had an agreement to provide the documents "within a week or two" before a yet to be determined deposition date; that [a]ppellees never responded to Blumberg [a]ppellants' proposed deposition date for over two (2) months; and that Maryland Rule 2–412(c) and 2–510(a) each state that a non-party deponent respond by producing documents "at the taking of the deposition" and "at a deposition", respectively and, the Maryland Discovery Guidelines, Guideline 6 "Assertions of Privilege at Depositions" contemplates asserting the privilege "during deposition" and provides that "an objection on the ground of privilege ... may be amplified by the objector subsequent to the deposition"?
(II) Did the lower court err in finding that the Blumberg [a]ppellants failed to "advance any facts or arguments" related to the non-highlighted portions of the privilege log (including communications with their

I. Did the circuit court err in ordering the production of documents over which the non-parties asserted a claim of privilege?

For the reasons that follow, we answer no and affirm the decisions of the circuit court.

The real party appellants present seven questions for our review with respect to the grants of summary judgment. We combine the questions and rephrase them as: [4]

former attorney Brian Frosh) and as such the Blumberg [a]ppellants' argument as to these communications is "waived"?
(III) Did the lower court err in making an overreaching ruling that each and every one of the Blumberg [a]ppellants' ". . . communications with non-attorneys were not privileged" despite the fact that an October 3, 2010 email communication was between two Pels Anderson clients (Mark and Susan) related to questions posed to Pels Anderson inquiring about the strength, weaknesses and strategy related to the Arent Fox litigation is within the gambit of a privileged communication?
(IV) Did the lower court err in finding that no privilege existed in communications between counsel for Herschel Blumberg (a board member), Marjorie Blumberg (a board member) and in house counsel because the privilege extends to counsel for board members and/or a common interest existed as the parties anticipated being engaged in litigation against a common adversary, regarding the same or similar issues and expressed intent to cooperate, the parties had the same legal counsel and it is in the interests of justice and fairness to preventing [sic] disclosure of the information?
(V) Did the lower court err in finding that this matter is not immediately appealable?

4. Appellants present seven questions for our review regarding summary judgment. They are:
(I) Did the trial court err in concluding that Arent Fox owed no duties to Blumberg, either as attorneys or confidential advisors, to take protective action over Mr. Blumberg, his companies, and his family and to refrain from actively overseeing and ultimately facilitating his consummation of financial transactions, which Arent Fox knew he could not understand?
(II) Did the trial court err in holding that there was no cause-in-fact as a matter of law where (a) the Blumberg entities would have been better off had Mr. Blumberg not proceeded with the $83 million Wells Fargo loan and the $57 million Key Bank loan, and had the Student Towers building been sold for $80 million; (b) the undisputed evidence shows that the Wells Fargo loan would never have occurred without both the signatures of Mr. Blumberg and each of his children; (c) a reasonable jury could find that undertaking the Wells Fargo and Key Bank loans, and rejecting the Student Towers offers, were highly imprudent actions

II. Did the circuit court err by awarding summary judg-

and that no rational decision-maker acting in Mr. Blumberg's place would have proceeded with them; and (d) a reasonable jury could find that had a competent, authorized decision-maker acting in Mr. Blumberg's place accepted the Student Towers offer, the transaction most likely would have been consummated?

(III) Did the trial court err in concluding that the officers of the Blumberg entities were guilty of contributory negligence as a matter of law where (a) contributory negligence is not a recognized defense to many of the Blumberg's claims; (b) disputes of material fact exist as to the reasonableness of the officers' actions in relying on the advice of Arent Fox to allow Herschel Blumberg to proceed with the challenged transactions; and (c) disputes of material fact exist as to the authority of the officers, when they learned about Mr. Blumberg's mental incapacity, and what precisely they knew?

(IV) Did the trial court err in concluding that the doctrine of *in pari delicto* applied as a matter of law where (a) the trial court articulated no grounds for this conclusion; (b) any alleged misconduct by the Blumberg children has no relevance whatsoever to the vast majority of the Blumberg claims, which are asserted by the Blumberg entities with which the children had no role at the time in question; (c) no evidence was adduced of any misconduct by the Blumberg children and, at a minimum, there was ample evidence to create disputes of material fact as to their actions?

(V) Did the trial court err in concluding that Blumberg's concealment claims were insufficient as a matter of law because certain officers of the Blumberg entities possessed the same knowledge as Arent Fox where (a) Arent Fox knew that only Mr. Blumberg was authorized to act on the information about the companies' imminent collapse and the offer to acquire the Student Towers building for $80 million; (b) Arent Fox knew that Mr. Blumberg was mentally incompetent to decide whether and on what terms to accept the Student Towers offer; (c) Arent Fox knew that the officers did not believe they possessed authority to make the decision; (d) Arent Fox knew that the officers could not communicate with anyone else at the companies competent to make the decision; (e) Arent Fox knew that the officers were relying on Arent Fox's advice that Mr. Blumberg could make the decision; and (f) Arent Fox knew that, in fact, Mr. Blumberg was the only one making the decision?

(IV) Did the trial court err in granting summary judgment generally for "the reasons set forth by Defendants," when the trial court did not explain which reasons it was accepting or why it was accepting those reasons that were expressed in a more than 2,500–page summary judgment submission, and where those reasons were all insufficient to justify summary judgment?

(VII) Did the trial court err in striking Blumberg's Second Amended Complaint without a hearing where the Second Amended Complaint merely sought to add detail to claims already articulated in the First Amended Complaint, and to the extent it was deemed more substantive, Blumberg was entitled to interpose the amendment?

ment on all issues in favor of appellees Arent Fox?

For the reasons that follow, we answer no and affirm the decisions of the circuit court.

## FACTUAL AND PROCEDURAL HISTORY

Herschel Blumberg, as appellants [5] note, "was a revered Prince George's County real estate developer and internationally recognized philanthropist." By 1971, with appellees acting as outside counsel, appellants had successfully developed the cornerstone of their holdings—a three-building office complex called Prince George's Metro Center. In 1998 and 1999, appellants began work on a long envisioned plan to expand the Prince George's Metro Center development. The expansion plan included two condominium towers, a fifth office building,[6] a student housing facility to be called Student Towers, retail space, a movie theater, a parking garage, and a plaza space. The new development also implemented a name change from Prince George's Metro Center to University Town Center. As part of the development plan for University Town Center, appellants decided on a scheme for refinancing certain loans, for accessing equity in existing properties and transferring it to the new project, and for incurring new debt obligations. During the financial restructuring that took place, appellants entered into a series of inter-company loans and received the proceeds from two externally sourced loans.

By the end of 2005, appellants were in the midst of constructing University Town Center. In appellees' words, "it had always been the appellant entities['] plan to start construction using their own funds and then, once substantial progress has been made, to obtain bank financing to continue and complete the project." By refinancing the mortgages on

---

5. The term "appellants" here, and throughout where not designated otherwise, refers to the real parties appealing from summary judgment and not the non-party appellants from the interlocutory discovery appeal.

6. The fourth building was completed in 2002 and was not part of the University Town Center expansion.

the buildings comprising Prince George's Metro Center, the Blumberg entities drained 40 million dollars of their own equity. The equity available through the refinancing was distributed through, and alternatively taken from, an entity called the Blumberg Family Limited Partnership. Monies were loaned among the companies, ultimately financing the early stages of development.[7] After the internal money was exhausted, the Blumberg entities searched for external funds to continue with construction.

To supplement the internally sourced funds, the companies negotiated, through former Vice President of Finance and Chief Financial Officer Samuel Tucker, the terms of an 83 million dollar loan from Wells Fargo, and a 57 million dollar loan from Key Bank. In May of 2006, the Blumberg entities began negotiating with Wells Fargo, closing the resulting loan on November 9, 2006. The Key Bank loan closed on April 30, 2007.[8]

---

**7.** The refinancing was only part of the inter-company loan scheme. For example, on July 9, 2004, Mr. Blumberg executed loans between the Blumberg entities in the following way: UTC Retail I, LLC executed a promissory note payable to Prince George Metro Center III, Inc.; UTC Retail I, LLC executed a promissory note to Prince George Center I, Inc.; UTC Retail II, LLC executed a promissory note to Prince George Center I, Inc.; UTC Retail III, LLC executed a promissory note payable to Prince George Center I, Inc.; UTC Retail IV, LLC executed a promissory note payable to Prince George Center I, Inc.; UTC Housing, LLC executed a promissory note payable to Prince George Metro Center III, Inc.; and UTC Housing I, LLC, executed a promissory note payable to Prince George Center I, Inc. That the scheme was complicated and confused even those who created it is not contested here.

**8.** In 2005, Key Bank made a short-term construction loan of 55 million dollars to appellants. The 57 million dollar permanent loan from Key Bank was arranged in 2007. As Mr. Tucker explained, "[t]he construction loan provides the funds that are necessary for constructing a project. And a permanent loan is after the project is built. . . . After the project is built, the tenants are in place and it's producing income, you then obtain a permanent loan." Mr. Tucker stated that by 2007, "the term on the construction loan was running out. The building was up, it was stabilized, and it was time to convert it from a construction loan to a permanent loan." The 2005 loan and the 2007 loan are not separate commitments of 55 and 57 million dollars each. The 2007 loan is a refinancing and restructuring of the 2005 loan.

Although Arent Fox provided legal advice to the Blumberg entities throughout the time they negotiated with Wells Fargo, Mr. Leval, the Arent Fox partner chiefly responsible for appellants' representation, only ran a conflicts check in July of 2006—months after negotiation of the loan's terms was underway—uncovering the fact that Arent Fox represented Wells Fargo in unrelated transactions. Wells Fargo executed a written waiver of the conflict, but it is contested whether or not Mr. Tucker, on appellants' behalf, executed a sufficient waiver.[9] Appellants contend, moreover, that the loans required most of the Blumberg entities' property to be pledged as collateral. For example, Dewey LLC, one of appellants' entities owned by the Blumberg children, was required to pledge its land holdings as collateral, even though it did not directly receive the proceeds of the loan distribution. The loans ultimately fell into default, the collateral was foreclosed upon, and the expansion project was not completed to appellants' expectation or satisfaction.

Possibly predating, but definitely running concurrent to the financing and construction, was appellants' concern for Mr. Blumberg's mental state. As appellants contend, "in the early 2000[']s, as planning for the [University Town Center] project proceeded, Mr. Blumberg began to show troubling signs of a cognitive decline." The record is replete with examples like that provided by former Senior Vice President and Chief Operating Officer Christopher Hanessian—"I voiced concerns about [the risks of construction, Mr. Blumberg's mental state, and undertaking the loans][10] to Messers. Leval, Blumberg and Tucker on numerous occasions prior to the Wells Fargo loan in 2006 and prior to the companies' own investment of

---

**9.** Appellee Leval testified that he obtained an oral waiver from Mr. Tucker. Mr. Tucker's testimony was that he could not recall if a waiver was granted in either oral or written form.

**10.** Mr. Hanessian's deposition testimony shows that he "had a thousand conversations" with Mr. Leval and that Mr. Hanessian "told [Leval] [ ] about episodes, [ ] about problems that he [Mr. Blumberg] was causing [,] potential bad things that could happen. And again, over time this all became more and more acute and often."

capital in the project." In April and June of 2007, Mr. Blumberg visited medical professionals about his condition, resulting in a diagnosis of dementia on June 8, 2007.[11]

In their five count complaint filed on October 27, 2010, appellants alleged malpractice on behalf of appellees, arguing generally that appellees had a duty to prevent their incompetent client[12] from entering into the loan transactions, or alternatively had a duty to have a guardian appointed for Mr. Blumberg. Specifically, appellants state that because of appellees' "roles as attorneys for the [appellants], [appellees] owed [appellants] a duty of diligence, competence, honesty and loyalty, and to remain free of conflicts that could compromise [appellees'] ability to at all times act in the best interest of [appellants]." Appellants contend that appellees breached their fiduciary duties by "deviati[ng] from the standard of loyalty generally afforded to clients by other similarly situated lawyers." Additionally, appellees allegedly breached their contract with appellants by "failing to diligently and competently provide legal services, and to protect [appellants'] interests above all others." Appellants made the further allegation that appellees "had a duty to disclose the existence" of letters of intent ("LOI") by various developers to buy one of the University Town Center buildings, Student Towers but did not do so.

At the close of pre-trial discovery, appellees filed nine motions for summary judgment and one motion to dismiss. Each motion pertained to a separate theory:[13] (1) the statute of limitations bars appellants' claims; (2) Arent Fox had no

---

11. There is no evidence in the record that appellees were either present during the examination or privy to the diagnosis, although it is alleged that they had actual knowledge of the underlying situation.

12. This statement assumes that Mr. Blumberg was the client. If the client is the Blumberg entities themselves, then competence is irrelevant because corporations cannot have mental states.

13. The following table arranges appellees' summary judgment motions by number and provides a brief summary of our disposition with respect to each.

duty to provide business advice; (3) Arent Fox did not breach a duty to have a guardian appointed for Mr. Blumberg; (4) appellants' claims are barred by contributory negligence and the doctrine of *in pari delicto;* (5) the conflicts alleged by appellants are either "illusory" or waived; (6) Arent Fox did not conceal any letters of intent; (7) Arent Fox did not conceal from appellants knowledge of their financial status; (8) there is no distinct cause of action for breach of fiduciary duty; [14] (9) the claim for malpractice does not support a breach of contract claim; and (10) appellants failed to prove causation. After a two day motions hearing, the circuit court orally granted appellees' motions in their entirety.

| Grounds For Motion | COSA Disposition |
| --- | --- |
| (1) Limitations | Affirmed on the basis of waiver. |
| (2) Appellees owed no duty to provide business advice. | Affirmed on the basis of waiver. |
| (3) Appellees did not breach a duty to have a guardian appointed for Mr. Blumberg. | Affirmed. |
| (4) Appellants' claims are barred by contributory negligence and the doctrine of *in pari delicto.* | Affirmed. |
| (5) The conflicts alleged by appellants are either "illusory" or waived. | Affirmed. |
| (6) Arent Fox did not conceal any letters of intent. | Affirmed. |
| (7) Arent Fox did not conceal from appellants knowledge of their financial status. | Affirmed. |
| (8) There is no distinct cause of action for breach of fiduciary duty. | Affirmed; *see Kann v. Kann,* 344 Md. 689, 713 (1997). |
| (9) The claim for malpractice does not support a breach of contract claim. | Affirmed on the basis of waiver. |
| (10) Appellants failed to prove causation. | Affirmed; moot in light of motion (4). |

**14.** As noted above, the eighth motion was a motion to dismiss, which the court treated as a summary judgment motion per Maryland Rule 2–322(c).

### Discussion

### The Interlocutory Discovery Disputes

#### The Catler Appeal

In advance of filing the lawsuit, on October 5, 2009, Marjorie Blumberg[15] and non-party appellant,[16] James Catler, ("Catler"), her long-time companion, retained the law firm of Shulman, Rogers, Gandal, Pordy, and Ecker, P.A. ("Shulman Rogers") to advise them on an "investigation of liability and recovery in Wells Fargo Bank and Key Bank loans."

Thereafter, Catler began reviewing 52 boxes of source documents containing information potentially relevant to future litigation. Catler and appellees dispute how to treat the fruit of his document review. Catler argues that Shulman Rogers engaged him as a litigation support consultant, thereby cloaking his work[17] with the protections of attorney-client

---

**15.** We note that Ms. Blumberg also filed a petition to be appointed guardian of her father Herschel's property. The petition was resolved by consent order on January 5, 2011, with Marjorie and John M. Quinn, Esq. appointed as co-guardians.

**16.** Because Catler is a non-party, he was able to take an interlocutory appeal, even though we are now considering the appeals on a consolidated basis. *Forensic Advisors, Inc. v. Matrixx Initiatives, Inc.*, 170 Md.App. 520, 530, 907 A.2d 855 (2006) ("In situations where the aggrieved appellant, challenging a trial court discovery or similar order, is not a party to the underlying litigation in the trial court, ... Maryland law permits the aggrieved appellant to appeal the order because, analytically, it is a final judgment with respect to that appellant.").

**17.** Catler alternatively refers to the output generated by his document review as work product or factual analysis and summary. What appellant produced, however, was not work product. Catler, a non-lawyer, lacks the ability to generate work product—at least in so far as it would support a resulting immunity from production. *E.I. du Pont de Nemours & Co. v. Forma–Pack, Inc.*, 351 Md. 396, 406, 718 A.2d 1129 (1998) ("Indeed, even though it is often referred to as a privilege, the work product doctrine is not a privilege at all, but is merely a requirement that very good cause be shown if the disclosure is made in the course of a *lawyer's* preparation of a case. Second, the work product doctrine is historically and traditionally a privilege of the *attorney* and

privilege and the work product doctrine.[18] Appellees take the position that Catler never enjoyed a privilege from document production. Alternatively, appellees argue that Catler waived his claim to privilege by giving in-depth deposition testimony.

Arent Fox served Catler with a subpoena and notice of deposition *duces tecum* on March 17, 2011. He responded by filing timely objections. Catler then produced some responsive documents and withheld those over which he asserted a protective privilege. In order to solidify his position with respect to privilege, he filed an emergency motion for protective order, hoping to "prevent[ ] the disclosure of all documents identified on the privilege log, as protected by the attorney-client privilege and the work-product doctrine."

At a two day motions hearing, the circuit court denied the emergency motion and ordered Catler to produce "all remaining documents responsive to the *Subpoena Duces Tecum* ... including all documents listed on [Catler's] privilege log for the James Catler Production, except the last eleven (11) documents listed on the log, which eleven (11) documents shall be provided ... to the [c]ourt for *in camera* review." After the court's review, it ordered the production of all but 24 pages of the eleven documents. Catler appealed, also moving to stay enforcement of the order,[19] claiming that "[f]orcing compliance with the orders under appeal would render the appeal largely moot and irreparably prejudice the [m]ovants'

---

not that of the client.") (internal citations and quotations omitted) (emphases added).

18. Although Catler's alleged consulting services were engaged from December of 2009, Shulman Rogers and Catler did not reduce their understanding to writing until February 3, 2011.

19. On May 25, 2011, Catler moved for a stay of the circuit court's order pursuant to Maryland Rule 2–632. Because the presiding judge in the circuit court was occupied with another trial, Catler filed a similar motion with us. We granted a temporary stay on May 27, 2011, in order to allow the circuit court to rule on the motion Catler filed there. The circuit court then denied Catler's motion and we, in turn, denied his request before us.

rights." [20] Ultimately, however, the documents were produced pursuant to court order.

## Invocation of Privilege

▆▆▆▆ The attorney-client privilege "is a rule of evidence which prohibits the disclosure of the substance of a communication made in confidence by a client to his attorney for the purpose of obtaining legal advice." *Levitsky v. Prince George's County*, 50 Md.App. 484, 491, 439 A.2d 600 (1982). The related but distinct work product doctrine "protects from discovery the work of an attorney done in anticipation of litigation or in readiness for trial." *E.I. du Pont de Nemours & Co. v. Forma–Pack, Inc.*, 351 Md. 396, 407, 718 A.2d 1129 (1998). Catler argues that the attorney-client privilege and the work product doctrine entitled him to withhold certain documents that were responsive to appellees' requests for documents. Appellees counter-argue that Catler was not a client of Shulman Rogers with respect to the lawsuit against Arent Fox and that his retention to provide litigation support was artificially constructed to meet the desired end of avoiding production.

▆▆▆▆ "Once the attorney-client privilege is invoked, the trial court decides as a matter of law whether the requisite privilege[d] relationship exists, and if it does, whether or not any such communication is privileged." *E.I. du Pont de Nemours & Co.*, 351 Md. at 415, 718 A.2d 1129 (internal quotation and citation omitted). Although the court makes a legal determination about the existence of a protective privi-

---

20. Appellees claim that because the allegedly privileged documents were produced, and Catler re-deposed, this appeal is moot. We disagree and will address the appeal issues. *See Harris v. State*, 420 Md. 300, 335, 22 A.3d 886 (2011) ("Appellate courts can remedy the improper disclosure of privileged material in the same way they remedy a host of other erroneous evidentiary rulings: by vacating an adverse judgment and remanding for a new trial in which the protected material and its fruits are excluded from evidence."). Because we affirm the grants of summary judgment, *infra*, however, our ruling necessarily cannot provide such relief. Thus, we will comment only briefly on these issues.

lege, "[t]he burden of substantiating non-discoverability is upon the party to whom the discovery request is directed, [ ] and the burden cannot be met by conclusory allegations or mere assertions." *Gallagher Evelius & Jones, LLP v. Joppa Drive–Thru, Inc.*, 195 Md.App. 583, 598, 7 A.3d 160 (2010) (internal quotation omitted). The circuit court makes a factual determination with respect to satisfaction of the burden. *Id.* ("Whether a document is subject to withholding from discovery as a result of some privilege is essentially a question of fact to be determined by the trial court."). But "the burden of establishing the privilege is on the party asserting the privilege." *Maxima Corp. v. 6933 Arlington Dev. Ltd. Partnership*, 100 Md.App. 441, 456, 641 A.2d 977 (1994).

█ We conclude that Catler was not a client of Shulman Rogers for the purpose of the litigation against Arent Fox. Accordingly, no attorney-client privilege attached to the documents that were withheld. We explain. First, the letter retaining Shulman Rogers on behalf of Catler and Ms. Blumberg insufficiently identifies the purpose for the representation to be a potential lawsuit against Arent Fox. Second, Catler was unable to provide testimony about when, or if, Shulman Rogers was representing him and in what capacity.

The subject line of the October 5, 2009 engagement letter signed by Catler and Ms. Blumberg reads "Investigation of Liability and Recovery in Wells Fargo Bank and Key Bank Loans." We consider the terms of the engagement letter objectively. *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941 (2004) ("Maryland courts follow the law of objective interpretation of contracts, giving effect to the clear terms of the contract regardless of what the parties to the contract may have believed those terms to mean."). The objective terms of the retention letter never state that Shulman Rogers was being retained for the purposes of a suit against Arent Fox. "Investigation of Liability and Recovery in Wells Fargo and Key Bank Loans" objectively refers to investigation only. Assuming *arguendo* that the investigation also includes litigation, within the ambit of the engagement letter may be future

litigation against not only the appellees here, but also against the banks themselves and/or the agents that played supporting roles at any point from inception of the loans to their disbursement. The language is too vague, especially in light of the complete record, to support the existence of an attorney-client relationship between Catler and Shulman Rogers with respect to litigation against Arent Fox.

In addition to the ambiguous terms of the letter of engagement, Catler "could not speak" to whether he personally retained Shulman Rogers for the purpose of filing suit against Arent Fox. He was asked at deposition, "at any point did you retain Shulman Rogers to file an action against Arent Fox [?]" He responded "I don't know. I really don't. I can't speak to that." We decline to find the existence of an attorney-client relationship where the purported client was unable to testify to the relationship's existence. *See Greenberg v. State,* 421 Md. 396, 406, 26 A.3d 955 (2011) ("[P]rivilege may be invoked only where a finding that the [proponent's] subjective belief [that] an attorney-client relationship existed would be minimally reasonable.") (internal quotations omitted). What Catler was able to testify to did not advance his position with respect to the existence of an attorney-client relationship in the manner now claimed, *viz.,* Catler agreed that "the exercise for which Shulman Rogers was originally retained was . . . a defensive retention meaning it was to determine what liability the family had." On these facts [21]—an engagement letter with vague terms and non-committal testimony—we do not find adequate support for the existence of an attorney-client relationship between Catler and Shulman Rogers for the purposes of suing Arent Fox.

---

**21.** In the guardianship proceeding that ran concurrent to the litigation here, Ms. Blumberg claimed that she "individually retained Shulman Rogers to conduct a review and analysis of all the documents pertaining to the loans and to render an opinion to her as to whether she faced any personal liability for the loans." Ms. Blumberg's admissions support the conclusion that Shulman Rogers was retained initially to assess only Ms. Blumberg's personal liability, although we do not place significant weight on this fact alone.

*The Mark Blumberg and Susan Blumberg Levin Appeal*

█ Mark Blumberg and Susan Blumberg Levin appeal from an order of the circuit court directing them to produce all documents recorded on their privilege logs. Among other pleadings with respect to the document requests in question, the Blumbergs filed a motion for protective order and Arent Fox responded by filing a motion to compel production. The circuit court held a hearing on the motions, ultimately denying the motion for protective order and setting the time frame under which all the questioned documents were to be produced. The court found that "not only were the privilege logs untimely and legally insufficient, but also that [Arent Fox] had been prejudiced. . . ."

As noted *supra,* "whether a document is subject to withholding from discovery as a result of some privilege is essentially a question of fact to be determined by the trial court[ ]" and that finding is entitled to deference on appeal. *Gallagher Evelius & Jones, LLP,* 195 Md.App. at 598, 7 A.3d 160 ("[T]he same deference [that] is accorded the trial court's fact-findings in a trial must be given the trial court's assessment of the circumstance surrounding a discovery situation."). The Blumbergs asserted protective privilege over several tranches of communications. Specifically, they withheld documents evidencing communications with Shulman Rogers, communications with Claudine Malone, the onetime board member of the Blumberg entities and trustee of the Herschel Blumberg Revocable Trust, communications with in house counsel Michael Crehan, and communications regarding the guardianship proceeding. Again, we conclude that the court correctly denied the claims of protection from the production of documents.

First, Shulman Rogers never represented either Mark Blumberg or Susan Blumberg Levin. The retainer agreement was signed only by Marjorie Blumberg and James Catler. In the circuit court's words, those messages "between [the Blumbergs] on the one hand and Shulman Rogers on the other hand simply were not privileged." We agree. Second, the

circuit court "made the same decision about Ms. Malone and Dickstein Shapiro." [22] A Dickstein Shapiro partner, Peter Jost, attested that "Dickstein Shapiro has never specifically represented Mark Blumberg, Susan Levin or any of the Blumberg companies, and has no retainer agreements with any of them." Third, with respect to communications between in house counsel Michael Crehan and Shulman Rogers, the circuit court found that "factually, at the time of these communications, Mr. Crehan was representing the [Blumberg] entit[ies] and Shulman Rogers was Marjorie Blumberg's personal lawyer." Based on this factual determination, the court held that neither Mark Blumberg nor Susan Blumberg Levin could assert a privilege stemming from the communications pertaining to the guardianship proceeding. The court also found that Mark Blumberg and Susan Blumberg Levin raised untimely attorney client privilege as a defense to production of documents in the malpractice case. The court correctly protected only communications between the Blumbergs and their counsel, Pels Anderson L.L.C. We find the circuit court's reasons sufficient to affirm its rulings in the first appeal. Thus, we turn our attention to the second appeal.

## The Summary Judgments

The facts and procedure relevant to our discussion of summary judgment have been laid out above; when additional facts become necessary to our discussion, they will be added.

### Standard of Review

The circuit court granted summary judgments to appellees. Under Maryland Rule 2–501(f), "[t]he court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." "The standard of review of a trial court's grant of a motion for

---

22. The Dickstein Shapiro law firm served as personal counsel to Ms. Malone.

summary judgment on the law is de novo, that is, whether the trial court's legal conclusions were legally correct." *Messing v. Bank of Am., N.A.,* 373 Md. 672, 684, 821 A.2d 22 (2003). As we said in the case of *Cooper v. Berkshire Life Ins. Co.:*

> [o]ur review of the grant of summary judgment requires us to determine whether a dispute of material fact exists, and whether the trial court was legally correct. Facts necessary to the determination of a motion may be placed before the court by pleadings, affidavit, deposition, answers to interrogatories, admissions of facts, stipulations, and concessions. We will review the same information from the record and decide the same issues of law as the trial court. In resolving whether a material fact remains in dispute, the court must accord great deference to the party opposing summary judgment. Even where the underlying facts are undisputed, if those facts are susceptible of more than one permissible inference, the trial court is obliged to make the inference in favor of the party opposing summary judgment. The court should never attempt to resolve issues of fact or of credibility of witnesses—these matters must be left for the jury.[23]

148 Md.App. 41, 56, 810 A.2d 1045 (2002) (internal quotations omitted). "When properly reserved, we pass upon the sufficiency of evidence to take a case to the jury...." *Benkoe v. Plastic Assembled Products, Inc.,* 231 Md. 419, 420, 190 A.2d 638 (1963); *Seaboard Surety Co. v. Richard F. Kline, Inc.,* 91 Md.App. 236, 244–45, 603 A.2d 1357 (1992); *Mackey v. Dorsey,* 104 Md.App. 250, 256–57, 655 A.2d 1333 (1995).

---

**23.** "It is frequently said that summary judgment should not be granted if there is the slightest doubt as to the facts. Such statements are a rather misleading gloss on a rule that speaks in terms of genuine issue as to any material fact, and would, if taken literally, mean that there could hardly ever be a summary judgment, for at least a slight doubt can be developed as to practically all things human. A better formulation would be that the party opposing the motion is to be given the benefit of all reasonable doubts in determining whether a genuine issue exists." *Clea v. Baltimore,* 312 Md. 662, 678, 541 A.2d 1303 (1988) (quoting C. Wright, The Law of Federal Courts § 99, at 666–667 (1983)).

Before reaching the merits, *infra*, it is necessary for us to expound briefly upon the permissible grounds for affirmation. Appellants contend that "Maryland appellate courts will not review a grant of summary judgment on grounds not specifically *articulated* by the trial court." (emphasis added). By substituting the word "articulated" for the phrase "relied upon", appellants attempt to narrow impermissibly the grounds to which we may anchor affirmance. *See Baker v. Montgomery County*, 427 Md. 691, 706, 50 A.3d 1112 (2012) ("Our review of the trial court's grant of summary judgment is limited ordinarily to the legal grounds *relied upon* explicitly in its disposition.") (emphasis added). Appellants point to the court's lack of "articulation" as a basis to circumscribe the scope of our review, claiming that we should "not entertain on this appeal any grounds for summary judgment other than those specifically articulated by the trial court." We will, however, adhere to the established rubric. *Warner v. German*, 100 Md.App. 512, 517, 642 A.2d 239 (1994) ("[W]hen analyzing the lower court's decision, we ordinarily are confined to the basis relied on by that court and may not otherwise explain its conclusion by introducing new legal theories.").

### The Circuit Court's Findings

Although the circuit court granted the motions "largely for the reasons set forth by Arent Fox[,]" the court supplemented this statement with a larger discussion punctuated by distinctive legal conclusions. In making an oral ruling on the motions for summary judgment, the circuit court remarked:

"[i]t is true ... that Maryland is very forgiving in allowing even slight evidence ... to go to the jury. [ ][B]ut it is not true that all evidence is legally sufficient evidence.... I'm going to grant the motions largely for the reasons set forth by the defendants, as amplified by my comments ... but simply by way of additional reasons, these are not my sole reasons, but my additional reasons ... it is my view that the evidence ... would require the jury to speculate, engage in surmise and conjecture [ ] I am not persuaded that based on the record, even viewed in the light most favorable to the plaintiffs, that a jury rationally, lawfully, in a non-

speculative way, could find cause in fact.... I am not persuaded that a rational jury would find, or could legally find, that it is more likely than not that the plaintiffs could have obtained a more favorable result, either by walking away from the Wells Fargo loan, by walking away from the Key Bank loan, or by walking away from the UTC project at any time.... Absent cause in fact, the case is over. And if I saw it, I would let it go to the jury. If I believed a rational jury, in a legally permissible, non-speculative way, might or could do it, I would let them do it.... I'm not *weighing credibility*. I am not making *factual findings*. I'm deciding as I turn that globe around, over and over, is there any possibility, reasonably and consistent with the law, that the plaintiffs can prevail on cause in fact, based on the current state of the record. And I have to tell you the evidence is no."

(emphases added). Notwithstanding the depth of the circuit court's oral ruling, even if it had agreed with appellees generally, without specifying which aspects of their position were persuasive, our review could still reach all of appellees' asserted grounds justifying summary judgment. *Kimmel v. SAFE-CO Ins. Co.*, 116 Md.App. 346, 354–55, 696 A.2d 482 (1997) ("If the trial court did not specify the grounds upon which it granted summary judgment, appellate courts assume that the trial court carefully considered all of the asserted grounds and determined that all or at least enough of them ... were meritorious." (internal quotation omitted)).

Our discussion necessarily begins with those motions that appellants fail to address. By failing to brief appellees' first, second, fifth (in part), and ninth motions, appellants have waived their right to contest them.[24] *See* Maryland Rule 8–504.[25] We next discuss the remaining motions and whether

---

**24.** *See supra,* note 14. As discussed further *infra,* we conclude that appellees waived their right to contest limitations, conflicts, certain aspects of their position on appellees' fiduciary duty, and their breach of contract claim.

**25.** Maryland Rule 8–504 requires, among other things, that the parties' briefs include argument in support of each position taken. Pursuant to

disputed material facts or errors of law exist, concluding that although the court erred in its treatment of appellants' expert witnesses, the error was harmless because the grant of summary judgment to appellees was correct as a matter of law. We explain.

### Limitations

Appellees argue that the statute of limitations bars a wide swath of appellants' claims.[26] As noted above, the complaint in this case was filed on October 27, 2010. Pursuant to section 5-101 of the Courts and Judicial Proceedings article, "[a] civil action at law shall be filed within three years from the date it accrues." Here, the parties entered into an agreement tolling the statute of limitations between September 17, 2009 and September 15, 2010.[27] Adding the time period covered by the tolling agreement to the statutory limitations period requires the court to bar claims which accrued before October 29, 2006.

 "[I]n Maryland in cases of professional malpractice the [Court of Appeals has] established the discovery rule—the rule that the cause of action accrues when the claimant discovers or reasonably should have discovered that he has been wronged."[28] *Watson v. Dorsey*, 265 Md. 509, 512, 290 A.2d 530 (1972). In the case of *Moreland v. Aetna U.S.*

---

section 8–504(c), "[f]or noncompliance with this Rule, the appellate court may dismiss the appeal or make any other appropriate order with respect to the case . . . ." "[I]f a point germane to the appeal is not adequately raised in a party's brief, the [appellate] court may, and ordinarily should, decline to address it." *DiPino v. Davis*, 354 Md. 18, 56, 729 A.2d 354 (1999).

26. Appellees' first motion for summary judgment focused on limitations.

27. The rationale for tolling was provided on the agreement's face: "[appellants] now believe they have or may have certain claims against [ ] [appellees]. However, none of the parties to this [a]greement desires [appellants] to assert those actual or potential claims at this time."

28. "[W]hether or not the plaintiff's failure to discover his cause of action was due to failure on his part to use due diligence, or to the fact that defendant so concealed the wrong that plaintiff was unable to discover it by the exercise of due diligence, is ordinarily a question of

*Healthcare, Inc.,* 152 Md.App. 288, 831 A.2d 1091 (2003), we said that:

> [w]hen a cause of action accrues is usually a legal question for the court. When the question hinges on the resolution of disputed facts, however, it is for the fact-finder to decide. Depending on the nature of the assertions being made with respect to the limitations plea, the determination [of whether the action is barred] may be solely one of law, solely one of fact, or one of law and fact.

*Id.* at 296, 831 A.2d 1091. Ordinarily, the dispositive issue is "when [ ] the appellant [was] put on notice that she may have been injured." *Russo v. Ascher,* 76 Md.App. 465, 470, 545 A.2d 714 (1988). "[B]eing on notice means having knowledge of circumstances which would cause a reasonable person in the position of the plaintiff to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged [wrong]." *Id.* (internal citation and quotations omitted).

Appellees argue that three of appellants' claims accrued before the limitations cutoff of October 29, 2006. First, appellees contend that appellants' assertions of conflicted advice, especially regarding the loan financing, are untimely. Second, appellees argue that claims based on business advice are barred. Third, appellees claim that if they had a duty to have a guardian appointed for Mr. Blumberg, a failure to satisfy that duty was no longer actionable by the limitations cut-off date.

■ Appellants have failed to address when any of the aforementioned causes of action accrued. At the summary judgment hearing, counsel for both parties argued this issue. Because a cause of action does not accrue until all of its elements are present, including damages, *Doe v. Archdiocese of Washington,* 114 Md.App. 169, 177, 689 A.2d 634 (1997), it appears that the circuit court implicitly found as a matter of

fact for the jury." *O'Hara v. Kovens,* 305 Md. 280, 295–96, 503 A.2d 1313 (1986). *Cf. Moreland v. Aetna U.S. Healthcare, Inc.,* 152 Md.App. 288, 296, 831 A.2d 1091 (2003).

law the date when appellants were first injured. The court found that the damages appellants suffered as a result of any conflicted advice they received occurred sometime during the loan's origination and not at its default, *viz.,* at a time preceding October 29, 2006.[29] We are constrained by our procedural rules to affirm the court's ruling without reaching its merits. Because they have failed to brief us appropriately, we conclude that appellants have waived their right to appeal from this portion of the court's order.[30] *See* Maryland Rule 8– 504(a) ("A brief shall . . . include the following items in the order listed: (6) [a]rgument in support of the party's position on each issue."); *Jacober v. High Hill Realty, Inc.,* 22 Md. App. 115, 125, 321 A.2d 838 (1974) ("We decline to consider the argument as it was not presented in the brief.").

The same conclusion must follow for both the business advice claims, discussed further *infra,* and the guardianship claims. Whatever business advice appellees dispensed in connection with or facilitating the loans necessarily took place before the limitations cut-off. Similarly, because of the transparency of Mr. Blumberg's mental decline, the need to appoint a guardian, if it arose at all, *must* have occurred before October 29, 2006.[31] We affirm, accordingly, the trial court's grant of summary judgment with respect to limitations.

---

**29.** Without argument on when appellants suffered damage resulting from appellees' allegedly conflicted advice with respect to the Wells Fargo loan, we must affirm the circuit court on the basis of waiver. At the motions hearing, appellants alleged that they suffered injury at the time they defaulted on the loan. Appellees argued that any injury occurred through the payment of legal fees that appellants knew was either the result of conflicted advice or of counseling that would ultimately lead an allegedly incompetent man to make irresponsible loan commitments. As discussed above, this question has not been presented for our review.

**30.** *See, e.g., DeGroft v. Lancaster Silo Co.,* 72 Md.App. 154, 159, 527 A.2d 1316 (1987) ("We shall not address the question of the propriety of the grant of summary judgment on the second count (negligence) for the simple reason that appellant did not present or argue the issue in his brief.").

**31.** In appellants' words, "[t]he decline was observed by a wide cross-section of those working closely with Mr. Blumberg. Numerous emails

Appellees argue, alternatively, that there "is no separate count or cause of action devoted to the business advice[,] business decision-making[,] or de facto officer theories; rather [appellants] attempt to shoehorn them into their standard causes of action for legal malpractice, breach of fiduciary duty, and breach of contract."[32] Appellants take the position that appellees breached the retainer agreement by, *inter alia,* "providing incompetent legal advice that [appellants] should enter into a complex set of financial transactions that were doomed to fail from the outset."[33] Not only have appellants failed to brief us on the implications of their 'de facto' officer theory,[34] but also they have failed to identify precedent that would make any business advice claims actionable. We conclude, therefore, that these claims also are waived on appeal. *De Groft v. Lancaster Silo Co.,* 72 Md.App. 154, 159, 527 A.2d 1316 (1987).

---

dating back to 2003 memorialize various company employees' awareness of Mr. Blumberg's cognitive decline...."

**32.** This argument was presented in appellees' second motion for summary judgment.

**33.** But Mr. Tucker testified that as of April 2007, "the belief was that the project would be successful and that he [Mr. Blumberg] would get the money back eventually. It was an investment in the University Town Center project, which he [Mr. Blumberg] was adamant that he wanted to see completed."

**34.** "A de facto officer has been defined as one in actual possession of an office under some colorable or apparent authority, who exercises the duties of the office under such circumstances of reputation and acquiescence by the public authorities and the public as is calculated to induce people, without inquiry, to submit to or invoke his official action, supposing him to be the officer he assumed to be." *Kone v. Baltimore County,* 231 Md. 466, 471, 190 A.2d 800 (1963). Appellants argue that appellee Leval was acting as a de facto officer of the Blumberg entities and therefore that he assumed heightened fiduciary duties. This reasoning is employed, in part, to shift the burden to have a guardian appointed or to take other protective measures from appellants to appellees. As will be discussed *infra,* the bylaws governing the University Town Center expansion placed the duty to act on the Blumbergs' corporate officers and not on appellee Leval.

We note that the decision to "enter into a complex set of financial transactions" is a *business* decision that only secondarily relies on *legal* advice. How to finance the companies, and any construction that they initiate, is a *business* decision. Legal advice may be sought or received about how to implement the decision (*e.g.*, how to incorporate investment vehicles, or what the tax consequences of the deals may be) but the decision to loan money from external sources or to transfer funds internally remains a business decision committed to the discretion of the companies themselves. We agree with the Supreme Court of California that "Courts are properly cautious about making attorneys guarantors of their clients' faulty business judgment." *Viner v. Sweet*, 30 Cal.4th 1232, 1241, 135 Cal.Rptr.2d 629, 70 P.3d 1046 (2003). We have uncovered no Maryland case foisting onto counsel the duty to indemnify its clients for the clients' own business judgments. We shall not impose that duty here.

Appellees recycle the limitations defense and apply it directly to appellants' claims that appellees failed to satisfy their duty of loyalty by giving conflicted advice.[35] Appellants identify three examples of appellees' allegedly impermissible conflicts. With respect to the Wells Fargo loan, the record reflects that appellees did not perform a conflicts check until July of 2006, well after "Mr. Tucker entered into negotiations with Wells Fargo on the terms of a potential construction loan to finance the condominium and retail portions of the UTC project." As appellants state, "[t]he conflicts check revealed that Arent Fox represented Wells Fargo in a large number of unrelated transactions." Appellants argue that although Arent Fox eventually learned of its conflict of interest, it took the steps necessary to obtain a waiver from Wells Fargo only, and did not receive a written waiver from Mr. Blumberg or the companies. Appellants secondarily identify alleged conflicts of interest with respect to the inter-company loans. As evidence of wrongdoing, appellants point to the fact that Dewey LLC, a

---

**35.** This argument was presented in appellees' fifth motion for summary judgment.

company owned by the Blumberg children, was required to pledge its land as collateral for the Wells Fargo loan even though Dewey did not directly benefit therefrom. Appellants allege that appellees acted negligently by permitting Dewey's land to be collateralized and by failing to advise the individual owners of Dewey to seek separate counsel during the loan negotiations. We are unable to address appellees' conflicts argument for the same reasons that precluded a discussion on the merits above, *i.e.,* a failure to brief us on how or when their injuries were sustained.

"The issue of when plaintiff knew or should have known of his injury and its cause is a question of fact for the jury." *CSX Transp., Inc. v. Miller,* 159 Md.App. 123, 153, 858 A.2d 1025 (2004). "In the case of actual knowledge, the cause of action accrues when the character of the condition and its cause first come together for the plaintiff." *Id.* "The test is not a could have known test[;] [r]ather, it requires a very substantial common-sense likelihood that a reasonably careful person would discover the existence of the injury and its cause." *Id.* But we are unable to address this question because the parties have not briefed it. Although the questions of conflict and waiver are contested, there is neither argument nor briefing concerning whether or not these claims are now time-barred. We have not been asked to answer when appellants were injured by the financing scheme ultimately enacted, or how the conflicted advice resulted in appellants' damages. By failing to brief us on the element of timeliness, appellants have left us with nothing to review. We conclude that appellants have waived their right to complain about the conflicts. *See* Maryland Rule 8–504(a) ("A brief shall ... include the following items in the order listed: (6) [a]rgument in support of the party's position on each issue."); *Beck v. Mangels,* 100 Md.App. 144, 149, 640 A.2d 236 (1994).

We conclude, as well, that appellants have waived one other purported claim. As noted *supra,* appellants take the position that appellees breached their retainer agreement, and therefore their contract, by, *inter alia,* "providing incompetent legal

advice that [appellants] should enter into a complex set of financial transactions that were doomed to fail from the outset." [36] Appellants, however, fail to add flesh to the bare bones of this allegation. Through their failure to brief us on the breach of contract claim, appellants have waived this assignment of error. Insofar as the breach of contract is premised on the rendering of conflicted advice, the circuit court found those claims to be untimely and we agree.

### Fiduciary Duties

To begin our discussion of fiduciary duty, we note that if count one of the complaint (legal malpractice) and count two (breach of fiduciary duty) were transposed into a Venn diagram,[37] then the resulting circles of legal malpractice and breach of fiduciary duty would overlap completely. In the case of *Kann v. Kann,* the Court of Appeals h[e]ld that:

> there is no universal or omnibus tort for the redress of breach of fiduciary duty by any and all fiduciaries. This does not mean that there is no claim or cause of action available for breach of fiduciary duty. Our holding means that identifying a breach of fiduciary duty will be the beginning of the analysis, and not its conclusion. Counsel are required to identify the particular fiduciary relationship involved, identify how it was breached, consider the remedies available, and select those remedies appropriate to the client's problem. Whether the cause or causes of action selected carry the right to a jury trial will have to be determined by an historical analysis. Counsel do not have available for use in any and all cases a unisex action, triable to a jury.

344 Md. 689, 713, 690 A.2d 509 (1997). As we said in the case of *Wasserman v. Kay,* "[i]n a claim for monetary damages at

---

**36.** This is the central theme of appellees' ninth motion for summary judgment.

**37.** "A Venn diagram or set diagram is a diagram that shows all possible logical relations between a finite collection of sets." http://en.wikipedia.org/wiki/Venn_diagram.

law [which appellants claim here], however, an alleged breach of fiduciary duty may give rise to a cause of action, but it does not, standing alone, constitute a cause of action." 197 Md. App. 586, 631–32, 14 A.3d 1193 (2011). "Here, the allegations in the count are relevant to other causes of action alleged (*e.g.*, fraud, [ ], breach of contract, and negligence [in the form of legal malpractice] ), but they do not constitute a stand alone nonduplicative cause of action." *Id.* We therefore affirm the court's grant of appellees' motion for summary judgment on this ground.

 Although appellants may not succeed on an individual count for the breach of fiduciary duty, the remedy for such a breach may be connected to another cause of action.[38] To link appellees' alleged breach of fiduciary duty to their legal malpractice claim, appellants argue that appellees had a duty to seek the appointment of a guardian for Mr. Blumberg.[39] Appellees respond by taking the position that no such duty exists; thus, they argue that there can be no recovery for failure to breach a non-existent duty no matter how the complaint is styled or what the allegation.[40]

---

**38.** That no direct cause of action exists for a breach of fiduciary duty is argued in appellees' eighth motion for summary judgment. As noted, Maryland does, however, allow for recovery from the breach of fiduciary duty, but the breach must be coupled with a proper cause of action. *Int'l Bhd. of Teamsters v. Willis Corroon Corp.*, 369 Md. 724, 728 n. 1, 802 A.2d 1050 (2002).

**39.** Guardianship was argued in appellees' third summary judgment motion.

**40.** "There can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another. It is consequently relative and can have no existence apart from some duty expressly or impliedly imposed. In every instance before negligence can be predicated of a given act, back of the act must be sought and found a duty to the individual complaining, the observance of which duty would have averted or avoided the injury.... As the duty owed varies with circumstances and with the relation to each other of the individuals concerned, so the alleged negligence varies, and the act complained of never amounts to negligence in law or in fact; if there has been no breach of duty." *Grimes v. Kennedy Krieger Inst., Inc.*, 366 Md. 29, 85–86, 782 A.2d 807 (2001).

Appellants contend that appellees knew of Mr. Blumberg's deteriorating mental state "as early as 1999, if not earlier." [41] Appellants argue that once appointed, a guardian would have halted the loan transactions, or at least mitigated their negative economic consequences. However, appellants do not limit their breach of duty, malpractice, and negligence allegations to appellees' failure to have a guardian appointed. Appellants state that "Arent Fox's [third] motion was premised on a mischaracterization of Blumberg's claims—that Blumberg's claims were limited to an assertion that Arent Fox breached the applicable standard of care by failing to have a guardian appointed for Mr. Blumberg." Appellants argue also that "even were Arent Fox correct that there was no duty to [have] [ ]a guardian [appointed], none of the five counts of Blumberg's [a]mended [c]omplaint subject to their motion should have been dismissed in their entirety, and Blumberg still should have been permitted to present to the jury evidence and argument respecting Arent Fox's violations of other duties owed Blumberg—including the duties to halt the transactions at issue and to take other remedial steps to ensure that the legal instruments the firm prepared were executed by a competent and authorized decision-maker."

In reviewing these allegations, we are mindful that: "a former client may have an action against a lawyer if the client can prove (1) the attorney's employment, (2) the attorney's neglect of a reasonable duty, and (3) loss to the client proximately caused by that neglect of duty." *Thomas v. Bethea*, 351 Md. 513, 528–29, 718 A.2d 1187 (1998).[42] Appel-

---

41. At paragraph seventy-six, appellants' complaint states that "[e]vidence of Mr. Blumberg's lack of mental capacity was known and available to Mr. Leval as early as 1999, if not earlier, and was repeatedly presented to Mr. Leval and other Arent Fox lawyers through June 2009, when Arent Fox's relationship with Mr. Blumberg and the companies was terminated." We note that individual appellee Gerard Leval was granted a general power of attorney for Mr. Blumberg, but not until December 17, 2007.

42. The Court of Appeal has "classified an action for attorney malpractice as being in contract, [of which] the gravamen is the negligent

lants attempted to establish a reasonable duty by referring to Model Rule of Professional Conduct 1.14. Pursuant to that Rule, "[w]hen the lawyer reasonably believes that the client has diminished capacity, is at risk of substantial physical, financial, or other harm unless action is taken and cannot adequately act in the client's own interest, the lawyer may take reasonably necessary protective action, including consulting with individuals or entities that have the ability to take action to protect the client and, in appropriate cases, seeking the appointment of a guardian ad litem, conservator, or guardian." As appellants contend, Rule 1.14 comprises the "ethics part" of the duty. Pertaining to the legal part, in the words of appellants' expert, Ms. Schwartz, "[t]here's case law that indicates that one has to have capacity in order to transact and sign contracts and to make informed decisions."

Appellees cite the predicates for action under Rule 1.14 to argue that, before a duty may attach, appellants must demonstrate that appellees knew or believed that (i) Mr. Blumberg was mentally incompetent, (ii) that the companies were at risk of substantial harm if protective action was not taken, and (iii) that the companies could not adequately protect their own interest. Assuming, without deciding, that the prerequisites to Rule 1.14 were present here, it states only that a lawyer "may take reasonably necessary protective action." The rule does not, on its face, *require* any action on appellees' part. Because of the permissive nature of the rule's applicability, in order to establish a duty owed, whether that duty was to seek the appointment of a guardian, to stop the loans from closing, or otherwise, appellants needed to rely on additional evidence to supplement the text of the model rule.[43]

---

breach of the contractual duty." *Flaherty v. Weinberg*, 303 Md. 116, 134, 492 A.2d 618 (1985). "[R]egardless of whether a plaintiff brings an attorney malpractice action in contract or tort, he must allege and prove the existence of a duty between the plaintiff and the defendant in the first instance." *Id.*

**43.** As stated in Professor Hazard's affidavit, "[appellees] misconstrue my deposition testimony ... I did not equate Rule 1.14 with the

As we said in the case of *CIGNA Prop. & Cas. Cos. v. Zeitler,* "[o]ften, allegations of professional malpractice require expert testimony, because the intricacies of professional disciplines generally are beyond the ken of the average layman." 126 Md.App. 444, 464, 730 A.2d 248 (1999). The Court of Appeals framed the need for expert testimony in malpractice cases by saying:

[i]n an action against a professional man for malpractice, the plaintiff bears the burden of overcoming the presumption that due skill and care were used. Although there may be instances in which the negligence is so gross or that which was done so obviously improper or unskillful as to obviate the need for probative testimony as to the applicable standard of care, (and here we proceed on the assumption that this is not such a case), generally there must be produced expert testimony from which the trier of fact can determine the standard of skill and care ordinarily exercised by a professional man of the kind involved in the geographical area involved and that the defendant failed to gratify these standards.

*Crockett v. Crothers,* 264 Md. 222, 224–25, 285 A.2d 612 (1972) (internal citations omitted). But expert testimony may be considered by the jury if and only if the requirements of Maryland Rule 5–702 are satisfied. Under Maryland Rule 5–702, expert testimony may be admitted if the testimony will assist the trier of fact in considering the ultimate issues. In determining the propriety of expert testimony, "the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony." *Id.* Respecting the third factor of Rule 5–702, the Court of Appeals has said, "no matter how highly qualified the expert may be in his field, his opinion has no probative force unless a sufficient factual basis

applicable standard of care, but instead explained that it sheds light on the standard of care, as does literature and case law."

to support a rational conclusion is shown." *Bentley v. Carroll,* 355 Md. 312, 337, 734 A.2d 697 (1999).[44]

■■■ We note initially that the court's ruling, in disagreeing with certain experts,[45] may have impermissibly made credibility determinations at the summary judgment stage. *Bentley,* 355 Md. at 334, 734 A.2d 697 (quoting *Bohnert v. State,* 312 Md. 266, 278, 539 A.2d 657 (1988)) ("[I]n a jury trial, the credibility to be given a witness and the weight to be given his testimony [shall] be confined to the resolution of all of the jurors."). Furthermore, of certain of appellants' experts, the court remarked, "professors are great but they teach. They

---

44. "In *Evans v. State,* 322 Md. 24, 585 A.2d 204 (1991), [the court] rejected the argument that the adequacy of the basis for the opinion of an expert goes only to the weight to be given to the expert's testimony, and not to its admissibility as evidence." *Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 741, 625 A.2d 1005 (1993). "It is well settled that the trial judge—not the expert witness—determines whether there exists an adequate factual basis for the opinion at issue." *Wood v. Toyota Motor Corp.,* 134 Md.App. 512, 523, 760 A.2d 315 (2000), *cert. denied,* 362 Md. 189, 763 A.2d 735 (2000).

45. For example, when appellants drew attention to the complexity of the loan agreements *vis a vis* Mr. Blumberg's allegedly diminished mental capacity, the court said, "some doctor thinks this is complicated? So what?" Appellants' real estate experts testified that the University Town Center expansion was exceptionally risky and did not comport with Mr. Blumberg's history of conservative investment and growth strategies. The court characterized one of appellants' real estate experts as a "professor who consults with REITs," asking "has she ever run one?" Another of appellants' experts testified to the economics of the loans and the prudence of the UTC project, stating that "[f]rom its inception, UTC was a very ambitious and risky project ... the project's capital structure [ ] undermined the viability of PGMC's most stable assets as nearly all of the equity was pulled from existing buildings and available cash was drained from related companies to finance new construction." The court characterized this expert's position by stating, "in her view, she's never seen a dumber deal on God's green earth, although I don't know I agree with her reasons...." The court, likewise, "d[id] not agree with" Professor Hazard's opinion of the standard of care. Appellees' counsel also focused on the experts' practical experience, stating at the motions hearing that, "[t]here's no testimony by Schwartz or Hazard as to what the common practice was." "Professor Hazard never sought the appointment of a guardian for anybody, doesn't represent elderly clients ... and Ms. Schwartz could point to no real life experience with situations like this one."

don't do ... they don't build the race car that you have to drive." While this may be the case, in our view, an academic background, without more, does not invalidate *per se* an expert's opinion. Practical experience, likewise, does not validate *per se* an expert's opinion. Although the court's treatment of appellants' experts merits our brief discussion, we are not convinced as a matter of law that it alone may serve as the basis for error. Rather, we find error in two other aspects of the court's ruling with respect to appellants' experts' testimony. We explain.

▇▇ Appellants argue that:

[t]he trial court misconstrued its role in connection with defining the standard of care by putting itself in the position of expert witness and purporting to determine for itself what degree of prudence and action the standard of care required of Arent Fox. The trial court held that 'the jury does not determine the standard of care. I determine, or the judge determines the standard of care.' The trial court then proceeded to offer its own opinion that the standard of care did not require action by Arent Fox, noting that it 'respectfully disagree[d]' with Professor Hazard.

In appellants' words, "the trial court misconstrued its role in connection with defining the standard of care by putting itself in the position of expert witness." We agree. Although the existence of a legal duty is a question of law for the court,[46] here, the duty owed had to be established by expert testimony. *Jones v. State*, 425 Md. 1, 26, 38 A.3d 333 (2012). Answering whether or not a party satisfied its duty is reserved for the jury. *Havens v. Schaffer*, 217 Md. 323, 327, 142 A.2d 824 (1958) ("What will amount to reasonable care is ordinarily a question for the jury."); *CSX Transp., Inc. v.*

---

46. *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 430 Md. 197, 60 A.3d 1 (2013); *Pace v. State*, 425 Md. 145, 154, 38 A.3d 418 (2012) (quoting *Bobo v. State*, 346 Md. 706, 716, 697 A.2d 1371 (1997)) ("The existence of a duty is a matter of law to be determined by the court and, therefore, is an appropriate issue to be disposed of on motion for dismissal.").

*Pitts,* 430 Md. 431, 61 A.3d 767 (2013); *Landon v. Zorn,* 389 Md. 206, 214, 884 A.2d 142 (2005); *Bernardi v. Roedel,* 225 Md. 17, 21, 168 A.2d 886 (1961).

The court additionally erred by finding that appellants' experts failed to state clearly enough the precise scope of the duty owed. Here, the court stated that:

> [i]t is clear in Maryland that if you need expert testimony to prove an element of a claim, and you do not have a legally sufficient expert opinion under 5–702, it is well settled as to that claim or as to that element, the trial court may properly grant summary judgment and dismiss the case. I want to highlight at least two defects in the expert opinions, as I see it. While both Ms. Schwartz and Ms. Fine are qualified ... my view is that their opinions are 'because I said so' opinions.... With respect to the expert opinions about the standard of care and the legal obligations of the law firm vis-a-vis a mentally challenged or a mentally disabled client, ... I was combining their opinions to understand what the standard of care was. And it's amorphous at best: do the right thing. Okay. It's too amorphous. It's too nebulous the way they've defined it. I am not saying there is no duty. I am not saying that some expert, in some case, at some time, can't do it. I'm saying they haven't done it. And since they haven't done it, for that additional reason, because the plaintiffs need that expert testimony and they don't have it, they cannot succeed on the claims which, on which such expert testimony is relying.

We address first the factual sufficiency of the expert testimony because it appears that the court's application of Maryland Rule 5–702 played a role in its ultimate decision, *viz.,* that the appellants' experts' testimony failed to identify the scope of duties allegedly owed.

Professor Hazard, one of appellants' standard of care experts, based his opinions on the "facts and evidence made available ... during the discovery process." He opined that "consistent with Rule 1.14, Mr. Leval should have taken reasonably necessary action to protect Mr. Blumberg's finan-

cial well-being, at a minimum preventing him from signing the legal instruments." Ms. Schwartz, another of appellants' experts, also based her opinions on the facts and evidence presented during discovery. She opined that "a reasonably prudent real estate lawyer under the circumstances presented to Gerard Leval would not have proceeded with the contemplated transactions, including the preparation and execution of loan documents with respect to those transactions that required the informed decision of Mr. Blumberg." The substantive thoroughness of their reports supports our view that appellants' experts' opinions were sufficiently supported by the record. This case does not raise questions about the mathematical or scientific methods through which appellants' experts reached their conclusions—it is not a case where the "supply of data" or "methodology" is at issue. *CSX Transp., Inc. v. Miller*, 159 Md.App. 123, 189, 858 A.2d 1025 (2004). Because Professor Hazard and Ms. Schwartz rendered their opinions about what actions this situation required of Arent Fox, and on the UTC expansion's propriety, it was sufficient for them to rely on the deal documents and evidence garnered through discovery.

Moving on from the factual basis for the expert testimony to its legal validity, we conclude that appellants sufficiently identified the duties that they were allegedly owed. It is appellants' experts' opinion that appellees had, at least, a duty to stop the loans from proceeding. Appellants' position is that because appellees knew or should have known that their client lacked the necessary capacity, they should either have prevented Mr. Blumberg from closing on the loans, or withdrawn from the representation. Although this is a fuzzy area, we think there was enough substance to the opinions to survive a motion for summary judgment. We are not convinced as a matter of law, as the circuit court was, either that appellants' experts' opinions lacked the necessary factual basis under Md. Rule 5–702, or that through them, appellants failed to identify a standard of care with the necessary precision. We conclude that appellants adequately defined a standard of care.

Whether to credit that standard was reserved for the jury. *Havens,* 217 Md. at 327, 142 A.2d 824.

 Although the court erred by finding appellants' expert opinions insufficient, we conclude that such error does not require reversal. "[I]t has long been the settled policy of this court not to reverse for harmless error." *Brown v. Daniel Realty Co.,* 409 Md. 565, 613, 976 A.2d 300 (2009). "[T]he burden is on the appellant in all cases to show prejudice as well as error." *Crane v. Dunn,* 382 Md. 83, 91, 854 A.2d 1180 (2004). "Prejudice will be found if a showing is made that the error was likely to have affected the verdict below." *Id.* "It is not the possibility, but the probability, of prejudice which is the object of the appellate inquiry." *Id.* This point will be discussed further, *infra,* but we conclude that the error was harmless because, assuming the benefit of their expert testimony, appellants' potential recovery remains barred by the doctrine of contributory negligence.

## Contributory Negligence

 The general theme of appellants' contributory negligence pervades appellees' various theories, although appellees commit a specific motion to arguing directly that recovery for negligence, if any, is barred by appellants' contributory negligence and the doctrine of *in pari delecto.*[47] Appellants take the position that the only person at the companies authorized to make material business decisions was Mr. Blumberg. Because Mr. Blumberg was the only empowered decision maker, appellants contend that appellees had the duty to stop the loans from proceeding—to take the figurative pen out of his hands. Appellants argue that the circuit court improperly "held that the junior officers' [Messers. Hanessian and Tucker] knowledge must, as a matter of law, be imputed to the Blumberg companies, and in this way the Blumberg companies contributed to their own losses by electing to move forward with the challenged transactions." Appellants argue

---

**47.** Appellees' directly argue their position on appellants' contributory negligence in their fourth motion for summary judgment.

that appellees' legal advice led directly to the questioned loan transactions. "[T]aking the trial court's finding to its logical conclusion, [appellants argue that] a client could never maintain a legal malpractice action against a law firm for improper legal advice when the client relied upon that legal advice, as the reliance on the challenged legal advice would always make the client contributorily negligent."

In our view, there are two flaws in appellants' reasoning. First, as we have discussed above, appellants' decision on how to raise capital was the product of their own business judgment and not insularly caused by appellees' legal advice. Second, this is not a case in which the court impermissibly extended itself into the boardroom in order to impute the junior officer's knowledge, (in this case, that of Messers. Hanessian and Tucker) to the corporation itself. As appellants state, "[i]n short, [appellants'] losses were foreseen by everyone around Mr. Blumberg." Even if the losses (and Mr. Blumberg's cognitive decline) were less than readily apparent, section 2–414(a) of the Corporations article resolves any imputation question in favor of appellees. MD.CODE ANN., CORPS. & ASS'NS § 2–414(a) ("As between himself and the corporation, an officer or agent of the corporation has the authority and shall perform the duties in the management of the assets and affairs of the corporation as: (1) Provided in the *bylaws;* and (2) Determined from time to time by resolution of the board of directors not inconsistent with the bylaws.") (emphasis added). By virtue of their own bylaws, discussed *infra,* the officers of University Town Center were obligated to act in the event of Mr. Blumberg's incapacity.

The court colorfully relayed its understanding of appellants' position, saying "[b]ut the way you're painting it, I think, the corporate officers were basically being told the sky is purple and they just said, okay, well, he [Mr. Blumberg] said the sky is purple and everybody knows the sky is not really purple, but he said it's purple, so let's pretend it's purple. It's just like the emperor has no clothes fable." Based on this assessment, the trial court held that "[t]he evidence ... makes out a case against the corporate officers for contributory negligence

as a matter of law." The court continued, stating that "[t]he bylaws of the corporation make it clear, not only did they have the power to engage in the conduct that is questioned here, they had the duty to run the company in the event Mr. Blumberg became disabled."

Appellants attempt, in vain, to escape this finding. However, the circuit court correctly determined that although the Blumberg entities may have considered Mr. Blumberg to be both necessary and singularly sufficient for making business decisions, the bylaws governing University Town Center confer decision making power on other corporate officers in the event that the president suffers incapacity. Specifically, the bylaws state that "[i]n the absence or disability of the President, the Vice President ... shall perform the duties and exercise the powers of the President." The bylaws continue, stating that "[n]o loans shall be contracted on behalf of the Corporation and no evidence of indebtedness shall be issued in its name without the endorsement of the Chairman of the Board, if any, the President, or a Vice President, if any." By their own governance documents, appellants demonstrate that decision making authority vested, at the time of Mr. Blumberg's incompetence—if ever—in the companies' Vice Presidents, Messers. Hanessian and Tucker.

"The question of contributory negligence must be considered in the light of all the inferences favorable to the plaintiff's case that may be fairly deduced from the evidence." *Patapsco & B. R. R. Co. v. Bowers,* 213 Md. 78, 88, 129 A.2d 802 (1957) (quoting *Baltimore Transit Co. v. Castranda,* 194 Md. 421, 434, 71 A.2d 442 (1950)). "[T]o establish contributory negligence as a matter of law, the act relied on must be distinct, prominent and decisive, and one about which ordinary minds cannot differ." *Crunkilton v. Hook,* 185 Md. 1, 6, 42 A.2d 517 (1945). Although the act here is, in reality, a *lack* of action—that of failing to prevent the loans from closing-we conclude that it was both prominent and decisive, notwithstanding that appellants argue that they cured their own negligence by informing Arent Fox of Mr. Blumberg's condi-

tion. Although appellants took *some* action, by way of informing Arent Fox of their suspicions that Mr. Blumberg was in the process of cognitive decline, the entities' Vice Presidents were ultimately the persons responsible to act, and the record demonstrates that they, at least, share responsibility in failing to prevent Mr. Blumberg from signing the loan documents.

"Where there is a conflict of evidence as to material facts relied upon to establish contributory negligence, or the act is of such a nature that reasonable minds, after considering all the circumstances surrounding the accident, may draw different conclusions as to whether it constituted contributory negligence, it is not for the court to determine its quality as a matter of law, but it is for the jury to pass upon it." *Schwier v. Gray*, 277 Md. 631, 635, 357 A.2d 100 (1976). But not here. With respect to preventing the loans from closing, either both parties were negligent or neither of them was. The facts, reduced to logical exposition, can be expressed only as: if A (Arent Fox's negligence) then also B (appellants' contributory negligence). The facts of this case do not permit an inference of if A then not B. "[D]ifferent conclusions" are not warranted here. *Schwier*, 277 Md. at 635, 357 A.2d 100.

The court added to its findings that the doctrine of *"in pari delicto* applie[s] [saying] . . . I could not in good conscience let the claims as to which the doctrine applied go to a jury." In the case of *Schneider v. Schneider*, 335 Md. 500, 508, 644 A.2d 510 (1994), the Court of Appeals explained that "the maxim, *in pari delicto potior est conditio defendentis* [stands for the proposition that] where fault is mutual, the law will leave the case as it finds it." *"[I]n pari delicto*, [ ] literally means in equal fault." 27A Am.Jur.2d Equity § 103. "The common-law defense of *in pari delicto* prohibits a party from recovering damages arising from misconduct for which the party bears responsibility, bears fault, or which resulted from his or her wrongdoing." *Id.* "Thus, relief will be denied where the parties are shown to have been *in pari delicto* or to have acted with the same degree of knowledge as to the illegality of the transaction." *Id.* As the circuit court acknowledged, only

rarely have our cases invoked this maxim. The extraordinary invocation notwithstanding, the record supports its application here. Assuming *arguendo* that appellees were guilty in their failure to act based on their knowledge of Mr. Blumberg's alleged incompetence, so too were appellants.

### *Fraudulent Concealment*

Appellees next focus on appellants' contention that they fraudulently concealed the "imminent financial collapse"[48] of the University Town Center companies and a letter of intent to purchase Student Towers.[49] The complaint alleges that appellees "had a duty to disclose the existence of the LOI to the Student Towers Entities pursuant to Maryland Rule of Professional Conduct 1.4." Appellants posit that "the competent owners of the Student Towers Entities justifiably relied on [appellee] Leval, as their trusted legal and business advisor, to disclose all information relevant to the operation of the Student Towers Property, and because they did not know that the LOIs existed, the owners of Student Towers Entities did not pursue the sale of the Student Towers property."

▮▮▮▮ In their complaint, appellants contend that appellees' actions amount to fraudulent concealment. In the case of *Lloyd v. GMC*, the Court of Appeals said that "[t]he essential elements for a claim of fraudulent concealment include: (1) the defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment." 397 Md. 108, 138, 916 A.2d 257 (2007) (quoting *Green v. H & R Block, Inc.*, 355 Md. 488, 525, 735 A.2d 1039 (1999)). "Fraudulent Concealment is any statement or other conduct which prevents another from acquiring knowledge of a fact. . . ." *Id.*

---

**48.** Summary judgment motion seven.

**49.** Summary judgment motion six.

Appellants, however, invert the parties' burden with respect to knowledge of the Blumberg entities' internal affairs. Appellants characterize themselves as passive players in a nefarious game presided over by their entrusted counsel. Appellants argue that appellees monopolized the internal workings of the Blumberg entities, wielding mutually exclusive possession over 100% of both the business decision making power and the knowledge supporting it. This argument, however, fails for the reason that to conclude otherwise would immunize businesses from taking responsibility for their own business judgments, the business judgment rule notwithstanding.[50] If appellants could succeed in shifting the responsibility for the negative economic effects of a business decision, then law firms would no longer be mere providers of legal advice—they would be transformed into sureties for the companies they advise.

The undisputed record reflects that on December 18, 2007, Cushman & Wakefield (whom appellants retained to solicit offers for Student Towers) received a letter of intent, purportedly valuing Student Towers at 80 million dollars. That same day, Cushman & Wakefield transmitted the letter of intent directly to the Blumberg entities. The letter of intent expired at 5:00 pm on December 24, 2007. Mr. Blumberg and Mr. Tucker decided to reject the letter because they felt the price was insufficient. On December 28, 2007, four days after the letter's expiration, appellants sent a copy of it to appellees for legal review. Six days after that, Mr. Tucker instructed appellees to cease work with respect to the letter. As a logical matter, appellees could not conceal, intentionally

---

**50.** "It is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. Absent an abuse of discretion, that judgment will be respected by the courts. The burden is on the party challenging the decision to establish facts rebutting the presumption." *Boland v. Boland*, 423 Md. 296, 328, 31 A.3d 529 (2011) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984)). The business judgment rule is codified at section 2–405.1 of the Corporations and Associations article.

or otherwise, a letter of intent that they became aware of only *after* appellants made the business judgment to reject it.

█ In a related claim, appellants assertion that appellees fraudulently concealed the "imminent financial demise" of the companies must also fail. This position, too, assumes that the entities' outside counsel knew more about the internal finances of the entities than they themselves did. The record reflects that knowledge of the financial problems faced by the companies and possessed by appellees was possessed by appellants also. Therefore, we conclude that appellees were not capable of *concealing* the "imminent financial demise" of the companies.

## *Causation*

Although causation [51] is moot in light of appellants' contributory negligence, it provides an alternate ground to affirm. Appellants argue that "the trial court appears to have rested its dismissal of Blumberg's claims for legal malpractice, breach of fiduciary duty, and breach of contract on a finding that wrongdoing by Arent Fox was not the proximate cause of the harms suffered by the Blumberg Parties." Appellants claim that the court erred by finding as a matter of law that they would not have obtained a more favorable result by abandoning the University Town Center expansion along with the Wells Fargo and Key Bank loans.

█ In order for appellants to succeed on their malpractice claims, they must demonstrate a "loss [ ] proximately caused by [ ] neglect of [a] duty [owed]." *Thomas,* 351 Md. at 528–29, 718 A.2d 1187. Similarly, "[i]n order to prevail on a claim of negligence in Maryland, a plaintiff must prove the existence of: (a) a duty owed by the defendant to the plaintiff, (b) a breach of that duty, and (c) injury proximately resulting from that breach." *Barclay v. Briscoe,* 427 Md. 270, 292, 47 A.3d 560 (2012).

---

**51.** Summary judgment motion number ten.

In the case of *Pittway Corp. v. Collins,* the Court of Appeals discussed the law relevant to causation by stating that:

[i]t is a basic principle that [n]egligence is not actionable unless it is a proximate cause of the harm alleged. Proximate cause involves a conclusion that someone will be held legally responsible for the consequences of an act or omission. To be a proximate cause for an injury, the negligence must be 1) a cause in fact, and 2) a legally cognizable cause. In other words, before liability may be imposed upon an actor, we require a certain relationship between the defendant's conduct and the plaintiff's injuries. The first step in the analysis to define that relationship is an examination of causation-in-fact to determine who or what caused an action. The second step is a legal analysis to determine who should pay for the harmful consequences of such an action.

Causation-in-fact concerns the threshold inquiry of whether defendant's conduct actually produced an injury. Two tests have developed to determine if causation-in-fact exists, the but for test and the substantial factor test. The 'but for' test applies in cases where only one negligent act is at issue; cause-in-fact is found when the injury would not have occurred absent or 'but for' the defendant's negligent act. When two or more independent negligent acts bring about an injury, however, the substantial factor test controls. Causation-in-fact may be found if it is 'more likely than not' that the defendant's conduct was a substantial factor in producing the plaintiff's injuries.

409 Md. 218, 243–44, 973 A.2d 771 (2009) (internal quotations and citations omitted). With regard to legal causation, the Court of Appeals has said "foreseeability of harm and manner of occurrence are the primary indicia of legal cause." *Board of County Comm'rs v. Bell Atlantic–Maryland,* 346 Md. 160, 184, 695 A.2d 171 (1997).

As noted above, in its oral ruling, the circuit court concluded that "I am not persuaded that based on the record, even viewed in the light most favorable to the plaintiffs, that a jury rationally, lawfully, in a non-speculative way, could find cause

in fact. . . . I am not persuaded that a rational jury would find, or could legally find, that it is more likely than not that the plaintiffs could have obtained a more favorable result, either by walking away from the Wells Fargo loan, by walking away from the Key Bank loan, or by walking away from the UTC project at any time. . . ."

▓▓▓▓▓▓ Ordinarily, the factual determination of proximate cause is reserved for the jury. *Sacks v. Pleasant*, 253 Md. 40, 46, 251 A.2d 858 (1969). Appellants argue that they should survive a motion for summary judgment because they presented evidence that it is "more probable than not that the [appellees'] negligence caused the alleged injury." The circuit court disagreed. We concur. Although appellants did not bear the burden of ruling out each and every cause of their injury other than appellees' alleged breaches of duty, they failed to produce evidence that those breaches more likely than not caused their purported damages.[52]

The University Town Center development, undisputably, did not produce the results that appellants envisioned. The record here supports a finding that it was, however, motivated by the Blumberg entities' longstanding goal of expanding the Prince George's Metro Center. The appellees could not have foreseen that this expansion project would coincide with our nation's largest recession since the Great Depression. That significant, intervening event is absent from appellants' version of the facts. Also missing is any explanation as to how their losses would have been stemmed or eliminated had the loan transactions not occurred or somehow been truncated. Unfortunately, instead of an expansion to their empire here, Rome fell. Proof of proximate causation is wanting, as the circuit court observed. We are not inclined to disturb its ruling on that issue.

---

**52.** As stated previously, even if they had produced sufficient evidence, our affirmation of the circuit court's application of contributory negligence moots the potential jury question generated by proximate cause.

JUDGMENTS OF THE CIRCUIT COURT FOR MONT-
GOMERY COUNTY AFFIRMED. COSTS TO BE PAID
BY APPELLANTS.

KRAUSER, PETER B., C.J., WOODWARD, PATRICK L.,
and ZARNOCH, ROBERT A., JJ., did not participate in the
Court's decision to report this opinion pursuant to Md. Rule 8–
605.1.